IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SWEET STREET DESERTS, INC., | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | |
| CHUDLEIGH'S LTD., | : | NO. 12-3363 |
| Defendant. | : | |

**MEMORANDUM RE: DEFENDANT'S MOTION TO DISMISS**

**Baylson, J.**                                                                                     **April 4, 2013**

## I.  INTRODUCTION

This is a case about trademarks and apple turnovers.  The Plaintiff, Sweet Street Deserts, Inc. ("Sweet Street"), alleges that Defendant, Chudleigh's Ltd ("Chudleigh's"), tortuously interfered with its business by wrongfully asserting a trademark right to an apple turnover product with a generic design.  Defendant has moved to dismiss Plaintiff's Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  For the reasons that follow, the Court will DENY in part and GRANT in part Chudleigh's motion.

## II.  FACTUAL ALLEGATIONS

Plaintiff seeks relief based on the following allegations:

Plaintiff and Defendant are bakery companies that, among other things, provide bakery products to restaurants and restaurant chains throughout the United States.  Compl. ¶¶ 6-7.  In or about July 2010, Plaintiff received a request for an apple desert product from the restaurant chain Applebee's Services, Inc. ("Applebee's").  Id. ¶ 8.  In response to this request, Plaintiff "created in-house a new individual sized baked good product composed essentially of apple filling and pie crust," which met Applebee's approval.  Id.

1

After receiving Applebee's approval, Plaintiff considered outsourcing production of the product to an outside vendor. Id. ¶ 9. In searching for a suitable vendor, Plaintiff discovered Defendant, and in September 2010, the parties began to "explore the possibility of entering into a business relationship, whereby Chudleigh's would manufacture Sweet Street's Apple Turnover product for a then undisclosed customer of Sweet Street." Id. ¶¶ 10-11. The parties signed a mutual nondisclosure agreement in which they committed "not to use any confidential information[1] of the other party for any purpose except to evaluate and engage in discussions concerning the Purpose." Id. ¶¶ 11-12. At no point during the parties' discussions "was there any mention that the shape of the Chudleigh's apple desert product was unique or proprietary to Chudleigh's . . . or that the product that Sweet Street was creating and producing as its Apple Turnover product was infringing any product or trademark of Chudleigh's." Id. ¶ 13.

After Plaintiff received samples of Defendant's proposed apple product in October 2010, Plaintiff decided against using Defendant as its outside vendor. Id. ¶ 14. According to Plaintiff, the samples that Defendant created "did not meet Sweet Street's specifications in terms of taste, quality of ingredients or look of the product."[2] Id. Shortly thereafter, Plaintiff decided it would produce the apple product in its own facilities. Id. ¶ 15. To do so, Plaintiff began working with a machinery manufacturer to obtain the necessary equipment for automating production. Id. ¶ 16. The manufacturer provided Plaintiff a list of items that would be needed, including a dough-folding machine made by a company (Forms and Frys) that provided the manufacturer a customized quote for a machine specifically tailored to make Plaintiff's product. Shortly afterwards, however, the company informed Plaintiff that it "would not make the dough folding

---

[1] Plaintiff gave certain information to Defendant about its apple product, "including the proposed volume to be manufactured, along with the ingredients . . . (but not the actual recipe)." Id. ¶ 11.
[2] Plaintiff also alleges that it severed relations because it was concerned Defendant "would use confidential information that it learned about Sweet Street's plans for its Apple Turnover products in order to unfairly compete with Sweet Street." Id. ¶ 14. The Complaint does not explain the basis for this concern.

2

machine for Sweet Street." Id. ¶ 17. Plaintiff believes, "[u]pon information and belief," that Forms and Frys's refusal to make the machine was the result of "being pressured by Defendant." Id. ¶ 18.

Eventually, Plaintiff was able to create its own in-house production process and, on or about August 15, 2011, Applebee's began selling Plaintiff's apple turnover on its menu. Id. ¶ 21. The turnover's tenure proved short-lived. On August 24, 2011, a Chudleigh's attorney sent Applebee's a letter demanding that the company cease selling the product. Id. ¶ 22. The attorney's letter stated that Applebee's turnover "looks strikingly similar to Chudleigh's well-known BLOSSOM design," for which Chudleigh's had obtained an "incontestable" trademark registration with the Patent and Trademark Office (PTO). Compl. Ex. A. Along with attaching a copy of its trademark registration (Reg. No. 2,262,208), the letter apprised Applebee's that Chudleigh's considered sale of the turnover to be "trademark infringement, unfair competition, false designation of origin, and an unfair and deceptive trade practice under federal, state and common law." Id.

Although Chudleigh's demand letter made no mention of Sweet Street, Plaintiff alleges, "[u]pon information and belief," that "Defendant knew that Sweet Street was supplying Applebee's with its Apple Turnover product" and that Defendant knew this "as a result of the confidential information that was disclosed to Defendant during the parties' business discussions in September and October of 2010." Compl. ¶ 24. Plaintiff also contends, "[u]pon information and belief," that "Defendant was aware that [the apple turnover] did not look like the configuration" in its trademark registration. Further, "Defendant was aware that it had no trademark rights in a configuration of what it identified as its 'BLOSSOM' product," because "Defendant did not, and does not utilize the configuration covered by the subject registration."

3

Id. ¶¶ 26, 44. Defendant was also allegedly aware "that the shape of [the BLOSSOM] product was and is not protectable as a configuration trademark," because it is a "generic configuration and is not capable of distinguishing Defendant's products from the products of others." Id. ¶¶ 26, 52.

Whatever Chudleigh's did or did not know, its demand letter convinced Applebee's to permanently cease selling Plaintiff's turnover. Id. ¶ 26. As a result, Plaintiff "has lost an opportunity to sell its Apple Turnover product to some of its other large customers because of Sweet Street's concern over Defendant's potential tortious interference with such relationships." Id. ¶ 27.

### III. PROCEDURAL HISTORY

Plaintiff filed a nine-count Complaint on June 12, 2012. In Counts I and II, Plaintiff seeks declaratory judgments that (1) its apple turnover does not infringe Defendant's trademark, and (2) Defendant's trademark is invalid. In Counts III, IV, and V, Plaintiff alleges three separate grounds (generic, fraud ab initio, and abandonment) upon which this Court should direct the PTO to cancel Defendant's trademark registration. In Counts VI, VII, VIII, and IX, Plaintiff alleges that Defendant violated state law by (A) tortiously interfering with Plaintiff's contractual relations with Applebee's, (B) tortiously interfering with Plaintiff's prospective contractual relations with Forms and Frys, (C) violating Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), and (D) breaching the non-disclosure agreement.

On October 10, 2012, Defendant moved to dismiss Plaintiff's Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. (ECF No. 6). Defendant argues that Plaintiff has failed to allege an actual controversy to support the Court's jurisdiction over its declaratory judgment claims, and, absent an actual controversy, the Court cannot

4

consider Plaintiff's requests for cancellation in Counts III, IV, and V. Defendant moves to dismiss Plaintiff's state law claims on various 12(b)(6) grounds, including its contention that a demand letter is protected activity under the Noerr-Pennington doctrine and thus cannot form the basis of a tortious interference claim. An oral argument was held to discuss these issues on March 5, 2013.

## IV. LEGAL STANDARDS

Where a defendant files a Rule 12(b)(1) motion to dismiss, the plaintiff bears the burden of persuading the court that it has subject matter jurisdiction. Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991). Where, as here,[3] the defendant's Rule 12(b)(1) motion sets forth a facial challenge to the plaintiff's complaint, "the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." Gould Elecs., Inc. v. United States, 220 F.3d 169, 176 (3d Cir. 2000). "When considering a facial attack, 'the Court must consider the allegations of the complaint as true.'" Petruska v. Gannon Univ., 462 F.3d 294, 302 n.3 (3d Cir. 2006) (quoting Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)).

Under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). While all factual allegations must be accepted as true, Erickson v. Pardus, 551 U.S. 89, 94 (2007), this requirement does not apply to legal conclusions, Iqbal, 556 U.S. at 678. A court must thus distinguish factual allegations from legal conclusions and assess if the factual allegations make out a "plausible claim for relief" for every legal claim asserted. Id. at 679.

---

[3] Defendant's 12(b)(1) motion is unclear as to whether it is premised on a facial, or factual, challenge to subject matter jurisdiction. To clarify this ambiguity, the Court asked the parties to submit supplemental briefs. (ECF No. 16). The issue was further addressed by the parties at oral argument, at which time the Court ruled that it would consider Defendant's motion a facial challenge.

5

## V. DISCUSSION

### A. Subject Matter Jurisdiction

The Declaratory Judgment Act (DJA) provides that "[i]n an actual case or controversy" a federal court "may declare the rights and other legal relations of any interested party facing such declaration." 28 U.S.C. § 2201(a). A dispute is a "case or controversy" if "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."[4] MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007). For the reasons discussed below, Plaintiff's allegations, taken as true, are sufficient to show that Sweet Street and Chudleigh's have adverse legal interests in a dispute that is both immediate and real; thus, an actual controversy exists.

### 1. Adverse Legal Interests

An "adverse legal interest" requires that the declaratory plaintiff have more than a mere "economic interest" in the resolution of its claim. Microchip Tech. Inc. v. Chamberlain Grp., Inc., 441 F.3d 936, 943 (Fed. Cir. 2006). This, in turn, requires that "there be an *underlying legal cause of action* that the declaratory defendant *could have brought* or threatened to bring." Id. (emphases added). In Microchip, the parties did not have adverse legal interests because plaintiff's product did not, by itself, infringe defendant's patent (i.e., plaintiff's product could only infringe defendant's patent if customers used the product in a particular manner).[5] Id. at 943-44. Since the Microchip plaintiff could not identify a single legal claim that defendant could have brought against it, the plaintiff did not have an adverse legal interest. Id. at 943.

---

[4] "[T]he phrase 'case or actual controversy' in the [DJA] refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III." MedImmune, 549 U.S. at 127.
[5] See also Matthews Int'l. Corp. v. Biosafe Eng'g, LLC, 695 F.3d 1322, 1329 (Fed. Cir. 2012) (holding declaratory judgment action to be non-justiciable because plaintiff's product could be operated in non-infringing manner, and plaintiff "alleged no facts" regarding whether its customers planned to use product "in a manner that could even arguably infringe [defendant's] Method Patents").

Here, unlike the circumstances in Microchip, Chudleigh could have filed, or threatened to file an infringement action against Sweet Street instead of—or in addition to—Applebee's, because Sweet Street's apple turnover did not require any alteration by Applebee's to (allegedly) infringe Chudleigh's trademark.

Defendant's attempt to avoid this conclusion falls short of the mark. Defendant argues it has no adverse legal interest with Plaintiff because it "did not object to any conduct on the part of Sweet Street," and its demand letter to Applebee's "included no reference to Sweet Street or its conduct that might trigger a controversy between the parties here." Def's Br. at 5 n.2; Def's Suppl. Br. at 2. The Federal Circuit, however, has squarely rejected this line of reasoning as "at best a transparent attempt to defeat" the standing of the product's supplier. Arris Grp., Inc. v. British Telecomm. PLC, 639 F.3d 1368, 1380 (Fed. Cir. 2011). The relevant question is not whether the defendant's threat against a customer expressly references the supplier, but whether "the supplier's product functions as a material component" to the allegedly infringing product. Id. at 1375-76. Here, Sweet Street did not just supply a "material component" to Applebee's turnover, it supplied the *entire* product. As in Arris, therefore, Sweet Street "had reason to fear that it could be sued" for infringement and thus is "entitled to seek declaratory relief, even though defendant ha[d] not yet directly charged plaintiff." Id. at 1376 n.6 (quoting Nippon Elec. Glass Co., Ltd. v. Sheldon, 489 F. Supp. 119, 122 (S.D.N.Y. 1980)). Accordingly, the parties have adverse legal interests.

**2. Immediacy**

The dispute in this case is sufficiently immediate to be an actual controversy. As with the dispute in Arkema Inc. v. Honeywell Int'l, Inc., 706 F.3d 1351, 1359-60 (Fed. Cir. 2013), the Plaintiff (1) is in the "*present* position of either committing to contracts that could expose it to liability for indirect infringement or abandoning its plans to supply," (2) "alleges a present

7

intent" to sell its product, and (3) has "already responded to at least one supply request," and is "poised to respond to other requests for quotations to supply." See also Cat Tech LLC v. Tubemaster, Inc., 528 F.3d 871, 882 (Fed. Cir. 2008) ("Constitutionally mandated immediacy requirements have been satisfied because once the threat of liability to Cat Tech has been lifted, it appears likely that TubeMaster can expeditiously solicit and fill orders for [the alleged infringing products]."). Since the alleged facts in Arkema were sufficient to meet the immediacy requirement, the Plaintiff's alleged facts here are sufficient as well.

**3.      Reality**

Whether or not a dispute has sufficient reality generally depends on "the extent to which the technology in question is 'substantially fixed' as opposed to 'fluid and indeterminate' at the time declaratory relief is sought." Matthews Int'l. Corp. v. Biosafe Eng'g, LLC, 695 F.3d 1322, 1330 (Fed. Cir. 2012) (quoting Cat Tech, 528 F.3d at 882). Here, Sweet Street alleges that it has already done the following: (1) designed the apple turnover, (2) obtained machinery to automate high-volume production of the turnover for national restaurant chains, and (3) sold the turnover to a customer (Applebee's). Compl. ¶¶ 8, 16, 19-21. While Defendant claims that the design of Plaintiff's turnover may have to change to suit the preferences of prospective customers (and thus could take on a non-infringing shape), Plaintiff alleges it has the *present* ability and intent to sell the product as is. Since this intent is clearly frustrated by Plaintiff's concern about exposing its customers, and itself, to liability, the Court is satisfied that Plaintiff's dispute is sufficiently real.

Since plaintiff's declaratory judgment claims are based on an actual controversy, the Court has subject matter jurisdiction over Plaintiff's declaratory judgment (Counts I and II) and cancellation (Counts III, IV, and V) claims. See Ditri v. Coldwell Banker Residential Affiliates,

8

Inc., 954 F.2d 869, 873 (3d Cir. 1992) ("[A] controversy as to the validity of or interference with a registered mark must exist before a district court has jurisdiction to grant the cancellation remedy.").

B.      **Tortious Interference with Plaintiff's Contractual Relations (Count VI)**

Defendant argues that Plaintiff's tortious interference claim in Count VI lacks facial plausibility because a presuit demand letter to protect one's trademark is a "privilege or justification" that cannot give rise to a tortious interference claim. See Phillips v. Selig, 959 A.2d 420, 429 (Pa. Super. 2008) (plaintiff claiming tortious interference must show "absence of privilege or justification on the part of the defendant"). As discussed below, presuit demand letters may be protected by the First Amendment's Petition Clause, at least where providing notice of one's injury is a statutory perquisite for filing an action in federal court. Defendant's presuit demand letter may thus well prove to be privileged activity that cannot form the basis of liability. At this stage in the proceedings, however, the Court finds that Plaintiff's Complaint, coupled with the undisputed public records provided by the parties, establishes a sufficient factual basis to plausibly infer that Defendant's trademark assertion was a "sham" unworthy of constitutional protection.

1.      **Noerr-Pennington and the First Amendment**

As an initial matter, the Court notes that one of the points of contention in this case (i.e., whether Noerr-Pennington immunity applies outside of the antitrust context) is ultimately academic in nature. Whether or not the Noerr-Pennington doctrine applies beyond antitrust claims, the First Amendment principles that give the doctrine its substantive meaning clearly do. See BE & K Constr. Co. v. Nat'l Labor Relations Bd., 536 U.S. 516, 525-26 (2002) (applying First Amendment principles of Noerr-Pennington to National Labor Relations Act); We, Inc. v. City of Philadelphia, 174 F.3d 322, 326-27 (3d Cir. 1999) ("This court, along with other courts,

9

has by analogy extended the Noerr-Pennington doctrine to offer protection to citizens' petitioning activities in contexts outside the antitrust area as well. . . . [T]he purpose of Noerr-Pennington as applied in areas outside the antitrust field is the protection of the right to petition."); see also New West, L.P. v. City of Joliet, 491 F.3d 717, 722 (7th Cir. 2007) ("Noerr-Pennington has been extended beyond the antitrust laws, where it originated, and is today understood as an application of the first amendment's speech and petitioning clauses."). Accordingly, this Court will assess the merits of Defendant's assertion of privilege under the rubric of the First Amendment's Petition Clause, and will utilize Noerr-Pennington doctrine to the extent it expounds First Amendment principles.

**2. Defendant's Presuit Demand Letter (if Genuine) Is Petitioning Activity**

The First Amendment protects "the right of the people . . . to petition the Government for a redress of grievances"; a right the Supreme Court has described as "one of the most precious of the liberties safeguarded by the Bill of Rights." BE & K, 536 U.S. at 524 (internal quotation marks omitted). The right to petition "extends to all departments of the Government," including the courts. Id. at 525 ("The right of access to the courts is . . . but one aspect of the right to petition." (quoting Cal. Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972))). The right to petition also extends to "private action," so long as the action is "incidental to a valid effort to influence a governmental action." Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492, 499 (1988).

Although the Third Circuit has not had occasion to decide if the right to petition encompasses private presuit demand letters in trademark litigation, it is likely that the Third

Circuit will rule in the affirmative.[6] Other courts have almost universally held, in the antitrust context, that presuit demand letters are immunized under Noerr-Pennington. See Sosa v. DIRECTV, Inc., 437 F.3d 923, 937 (9th Cir. 2006) (citing cases). Since Noerr-Pennington immunity is "based" on "First Amendment principles," Cheminor Drugs, Ltd. v. Ethyl Corp., 168 F.3d 119, 128 (3d Cir. 1999), there is little intelligible reason why presuit demand letters in the antitrust context should be treated differently than those in analogous statutory contexts. See Sosa, 437 F.3d at 937 (finding it irrelevant that "all of the appellate cases that have extended immunity to presuit settlement demands have done so in the context of antitrust suits").

The case for granting First Amendment protection to presuit demand letters is particularly strong where, as here, a statute precludes judicial remedies for those plaintiffs that did not provide prelitigation notice of their alleged injury. See Select Comfort Corp. v. Sleep Better Store, LLC, 838 F.Supp.2d 889, 898 (D. Minn. 2012) (noting that the only federal appeals court to hold that the First Amendment does not protect private prelitigaton demand letters, Cardtoons v. Major League Baseball Players Ass'n, 208 F.3d 885, 894 (10th Cir. 2000), did so in a statutory context where judicial remedies were not conditioned upon provision of presuit notice). Under the federal law governing trademark infringement claims, trademark registrants are barred from recovering profits or damages if they do not notify the infringing party of the alleged infringement prior to filing their complaint. 15 U.S.C. § 1111. Thus, if Chudleigh's never notified Applebee's of its registered trademark, it would have lost its ability to secure judicial relief for the damages it incurred from Applebee's alleged infringement. Accordingly, the good faith service of a demand letter in the trademark infringement context represents the type of "private action . . . incidental to a valid effort to influence a governmental action" that warrants

---

[6] See Hankin Family P'ship v. Upper Merion Tp., No. 01-1622, 2012 WL 43599, at *18 n.24 (E.D. Pa. Jan. 6, 2012) ("In all likelihood [a demand letter] is not actionable because it involves protected conduct under the Petition Clause of the First Amendment to the U.S. Constitution and under the Noerr–Pennington doctrine.").

11

protection under the First Amendment's Petition Clause. See Allied Tube, 486 U.S. at 499 (1988). This conclusion, however, does not end the inquiry.

**3. The "Sham" Exception**

As with other constitutional rights, the right to petition is not absolute. To receive First Amendment protection, litigation activity must be "genuine," not a mere "sham." BE & K, 536 U.S. at 525-26. "[S]ham litigation is present where the lawsuit is objectively baseless and subjectively motivated by a desire to impose anticompetitive harm from the judicial process rather than obtain judicial relief." Erbe Elektromedizin GmbH v. Canady Tech. LLC, 629 F.3d 1278, 1291 (Fed. Cir. 2010) (citing Prof'l Real Estate Investors v. Columbia Pictures Inds., Inc. ("PRE"), 508 U.S. 49, 60-61 (1993)). Plaintiff must sufficiently plead, therefore, that the demand letter was both "objectively baseless" and "subjectively motivated" by anticompetitive intent.

**(a) Objective Baselessness**

Litigation activity is "objectively baseless" if "no reasonable litigant could realistically expect success on the merits." PRE, 508 U.S. at 60. This is a demanding standard to meet, particularly where, as here, the demand letter ostensibly concerns a trademark which the litigant has registered with the PTO. The Plaintiff, however, has alleged facts—and more importantly, both parties have produced public records—that raise a factual question about whether a reasonable litigant could have believed its trademark was implicated by Plaintiff's product.

At least for purposes of a Rule 12(b)(6) motion, the Court finds it significant that visual comparisons reveal obvious differences between Defendant's trademarked design and the actual apple products that Plaintiff *and* Defendant have commercially produced. See Compl. Exs. A, D, E; Def's Rep. Br. Ex. A at 11. Although the three designs are each circular, and although they each have an arguably flower petal-like look to them, the trademarked design uses a notably

12

different approach for connecting the "petals" than the two commercially sold products. Whereas the trademarked design connects each "petal" through a continuous dough-folding pattern that causes each petal to uniformly point in a clockwise direction, the two commercially produced products separate the petals through gaps in the dough that enable the petals to fold over the pie center without a noticeable clockwise tilt. The obviousness of this difference lends plausibility to Plaintiff's allegation that "there has been and is no likelihood of confusion between any protected element of [Defendant's registered design] and the Sweet Street Apple Turnover product." Compl. ¶ 30. Discovery may disclose evidence that warrants a different conclusion; at this stage, however, the obviousness of the difference is sufficient to justify an inference of objective baselessness. The Court will thus proceed to the subjective component of the sham inquiry.

**(b)    Subjective Motivation**

Plaintiff has plausibly pled that Defendant's demand letter was sent in bad faith. A number of factors support the plausibility of Plaintiff's allegation. First, the fact that the Exhibits show an obvious visual difference between Defendant's registered design and Plaintiff's product lends plausibility to Plaintiff's allegation that Defendant "was aware" at the time it sent the demand letter that Plaintiff's product "did not look like the configuration registered by Defendant." Compl. ¶ 25. Second, Plaintiff alleges that Defendant had expressed no trademark concerns with Plaintiff's proposed apple product during the parties' brief exploratory business relationship in the Fall of 2010. Id. ¶ 13. Third, Plaintiff has alleged a pattern of "scare-the-customer-and-run" tactics that have long been the hallmark of those seeking to use "judicial process" as an "anticompetitive weapon." See Teva Pharms. USA, Inc. v. Novartis Pharms. Corp., 482 F.3d 1330, 1336 n.2 (Fed. Cir. 2007). Specifically, Plaintiff alleges that Defendant

13

only issued threats to third parties which had little incentive to litigate (i.e., Forms and Fry and Applebee's), rather than to Plaintiff directly.[7] Accordingly, Defendant's reluctance to directly threaten Plaintiff (the party with an incentive to litigate) suggests a lack of confidence in the merits of its legal assertions. Taken together, Plaintiff's allegations satisfy the subjective prong of the sham litigation exception.

## 2. Tortious Interference with Plaintiff's Contractual Relations (Count VII)

Plaintiff alleges that Defendant interfered with its prospective contract with Forms and Frys by pressuring the company to not make a dough-folding machine. Defendant has moved for dismissal of the claim because (1) a prospective contract cannot be established on "mere hope" alone, and (2) Plaintiff "does not provide even the faintest indication of how Chudleigh allegedly 'pressured' Forms and Frys.'"[8] Def's Br. at 11-12. Contrary to Defendant's assertions, Plaintiff's factual allegations are sufficient to make out a plausible claim for relief.[9]

Plaintiff's Complaint asserts a plausible prospective contractual relationship with Forms and Fry. Plaintiff alleges that Forms and Fry provided a quote for a dough-folding machine that was specifically customized to Sweet Street's proposed turnover design. Receiving a customized

---

[7] Plaintiff alleges that Defendant knew Plaintiff was the supplier of Applebee's turnover. Plaintiff's allegation is based on the following averments: (1) the Defendant learned of Sweet Street's intent to produce a turnover for a major restaurant chain during the parties' exchange of confidential information in the Fall of 2010, and (2) Defendant sent Applebee's a demand letter very soon after Applebee's launched the product. Compl. ¶¶ 11-14, 21-22; Pl's Resp. Br. at 4-5.

[8] Defendant argues that Plaintiff's claim is deficient because its Complaint (1) "does not allege who participated in this 'contact,' on either side"; (2) "does not allege when it occurred"; (3) "does not allege what Chudleigh (or its agent) said"; (4) "does not allege how Forms and Frys responded"; and (5) "does not allege how any such 'contact' interfered with Sweet Street's supposed business relationship with Forms and Frys." Def's Br. at 11-12.

[9] "Under Pennsylvania law, to prevail on a claim for tortious interference with existing or prospective contractual relationships, a party must prove: (1) the existence of a contractual or prospective contractual or economic relationship between the plaintiff and a third party; (2) purposeful action by the defendant, specifically intended to harm an existing relationship or intended to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; (4) legal damage to the plaintiff as a result of the defendant's conduct; and (5) for prospective contracts, a reasonable likelihood that the relationship would have occurred but for the defendant's interference." Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 212 (3d Cir. 2009).

quote for a complex piece of machinery gave Plaintiff more than a "mere hope" that a contractual relationship was likely.

Further, since it makes little sense for a company to issue customized quotes for products it has no intent of producing, Forms and Fry's sudden refusal to produce the dough-folding machine suggests that unusual circumstances were afoot. There may, of course, be other explanations for Forms and Frys's sudden reversal. According to Plaintiff's allegations, however, Forms and Frys stated that it "would not make the dough folding machine *for Sweet Street*," and that it "refused to do business *with Sweet Street*." Compl. ¶¶ 17, 57 (emphases added). Drawing all reasonable inferences in Plaintiff's favor, these allegations suggest that Forms and Frys had a specific aversion to working with Plaintiff which gives more plausibility to the claim of tortious interference—particularly since it is consistent with the undisputed fact that another third party (Applebee's) abruptly terminated contractual relations after being pressured by Defendant. The Court will thus deny Defendant's motion with respect to this claim.

3. **Remaining State Law Claims (Counts VIII & IX)**

The Court agrees with Defendant that Plaintiff's remaining state law claims fail as a matter of law. The breach of contract claim fails because Plaintiff's own allegations, coupled with the language of the contract attached to the Complaint, show that Defendant did not breach the parties' mutual non-disclosure agreement. See McShea v. City of Philadelphia, 995 A.2d 334, 340 (Pa. 2010) ("To successfully maintain a cause of action for breach of contract the plaintiff must establish . . . a breach of a duty imposed by the contract . . . ."). Plaintiff alleges that Defendant breached the contract by using "confidential information learned as a result of the business discussions in order to contact [Applebee's] in an attempt" to become the supplier of Applebee's apple turnover. Compl. ¶ 65. There is at least one fatal flaw with this allegation: Plaintiff admits in its Complaint that Defendant did not send the demand letter until nine days

15

after Applebee's, a national restaurant chain, began selling the turnover to the general public. Compl. ¶ 21. This is significant because the contract states that "Confidential information shall *not* include *any* information which . . . becomes *publicly known* and made *generally available* after disclosure by the Disclosing Party to the Receiving Party through no breach of the Agreement by the Receiving Party." Compl. Ex. C (emphases added). Obviously, Applebee's sale of the turnover was not the result of Defendant's breach. Accordingly, Defendant's demand letter—which focused strictly on the similarity between *Applebee's product* and *its own*—did not use or disclose any "confidential information" obtained from Sweet Street.

Plaintiff's UTPCPL claim, which is closely connected to its contract claim, fails for similar reasons. Plaintiff alleges that Defendant violated the UTPCPL by committing "unfair or deceptive acts." Compl. ¶ 61. Although the Complaint does not specify which "acts" Plaintiff is referring to,[10] the law is clear that, to be actionable, the acts must have been ones that caused an injury to Plaintiff as a result of *Plaintiff's* "justifiable reliance" on them. See Belmont v. MB Inv. Partners, Inc., 708 F.3d 470, 499 (3d Cir. 2013) ("[A] UTPCPL plaintiff must demonstrate that he justifiably relied on the defendant's deceptive practice and that he suffered harm as a result of that reliance."); Yocca v. Pittsburgh Steelers Sports, Inc., 854 A.2d 425, 438 (Pa. 2004) ("To bring a private cause of action under the UTPCPL, a plaintiff must show that he justifiably relied on the defendant's wrongful conduct or representation and that he suffered harm as a result of that reliance."). Here, the only relevant act by Defendant that Plaintiff alleges relying upon was Defendant's contractual commitment to not use confidential information for an improper purpose. While a contractual breach resulting from malfeasance qualifies as a deceptive act, Horowitz v. Fed. Kemper Life Assur. Co., 57 F.3d 300, 307 (3d Cir. 1995), Plaintiff does not plausibly allege a breach because—as discussed above—Plaintiff's allegations show, at most,

---

[10] The Plaintiff also does not specify which specific provisions of the UTPCPL the Defendant violated.

that Defendant used "confidential information" when it was no longer confidential under the terms of the contract. Irrespective, therefore, of whether UTPCPL claims must meet the heightened pleading standard of Rule 9,[11] Plaintiff's claim fails as a matter of law.

## VI. CONCLUSION

For the foregoing reasons, the Court will DENY Defendant's Motion to Dismiss Counts I through VII of Plaintiff's Complaint, but will GRANT Defendant's Motion to Dismiss Counts VIII and IX.

An appropriate order follows.

O:\CIVIL 12\12-3363 sweet street v. chudleigh's\mtd_opinion.docx

---

[11] Courts in this District have expressed different views on the applicability of Rule 9 to UTPCPL claims. Compare Montanez v. HSBC Mortg. Corp. (USA), 876 F. Supp. 2d 504, 519 (E.D. Pa. 2012) with Kee v. Zimmer, Inc., 871 F. Supp. 2d 405, 412 (E.D. Pa. 2012).