CONFIDENTIAL – ATTORNEY'S EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| _____ | : | |
| SWEET STREET DESSERTS, INC., | : | **CIVIL ACTION** |
| Plaintiff, | : | **NO. 5:12-cv-3363-MMB** |
| | : | |
| v. | : | |
| | : | |
| CHUDLEIGH'S LTD., | : | |
| | : | |
| Defendant. | : | |
| _____ | : | |

## SWEET STREET'S RESPONSES TO CHUDLEIGH'S LTD. STATEMENT OF UNDISPUTED FACTS

Plaintiff, Sweet Street Desserts, Inc. ("Sweet Street") responds to defendant Chudleigh's Ltd.  ("Chudleigh's") statement of facts as to which it contends there is no genuine issue:

1.      Chudleigh is a family-owned apple farm and bakery in Milton, Ontario.  (Ex. 1, First Deposition of Scott Chudleigh, November 14, 2013 ("S. Chudleigh Dep.") 12:2-5, 58:8-22; and Chudleigh's Ltd.'s Amended Answer, Affirmative Defenses, and Counterclaims, July 2, 2013, p. 10, ¶ 3 (Docket No. 29) ("Chudleigh's Amended Answer".)

**RESPONSE**: Admitted.

2.      In the mid-1990s, Scott Chudleigh, Chudleigh's President, developed a single-serving fruit pie with his wife, Mary Chudleigh, which they called the "Blossom Pie."  (Ex. 1, S. Chudleigh Dep. 50:9-64:17.)

**RESPONSE**:  Admitted in part; denied in part. Admitted only that Scott Chudleigh's testimony was that he and his wife developed a single-serving *apple* pie, not fruit pie. (Chudleigh 30(b)(6) Dep. at 51:6.) Denied that Scott and Mary Chudleigh "developed" the product marketed by Chudleigh's as a Blossom Pie. The shape of the Blossom Pie has

CONFIDENTIAL – ATTORNEY'S EYES ONLY – SUBJECT TO PROTECTIVE ORDER

been used by bakers since the 1500s (Lavornia Report at 6), and this classical shape of dough pleated around a fruit filling has been demonstrated by well-known figures such as Martha Stewart and Ina Garten, baking industry giants such as Betty Crocker, individual home bakers, and commercial restaurateurs. (Supp'l Grossberg Decl. at ¶¶ 4-5.)

3.      Scott and Mary Chudleigh chose a six-petal design for the Blossom Pie because they thought it was beautiful ("Blossom Design").  (*Id.* at 61:25-62:18.)

**RESPONSE**: Admitted in part; denied in part.  Denied that Scott and May Chudleigh chose a "six-petal" design.  The design allegedly chosen by Scott and Mary Chudleigh had six folds, not six petals. (Chudleigh 30(b)(6) at 61:22-62:9.)  This distinction is important in describing which of the several designs Chudleigh's is claiming rights in. Admitted that Scott Chudleigh testified that he couldn't make the single-serve apple pie in the shape of a slice of pie because it needed too much pastry (Chudleigh 30(b)(6) Dep. at 52:13), while a square would be heavy, cost more and difficult to work with at a restaurant level, and a long shape wasn't strong enough (Chudleigh 30(b)(6) Dep. at 52-54).  Instead, they chose a shape which would "mimic a round apple pie." (Chudleigh 30(b)(6) Dep. at 54:6-7.) There was no way to contain the filling if it was just left on a flat piece of pastry. (Chudleigh 30(b)(6) Dep. at 56:7.) The folds were a pretty way to finish the top. (Chudleigh 30(b)(6) Dep. at 55:10-11). Ultimately, they decided on six-fold (not petals) because of the size of the product and the amount of filing inside of the product. (Chudleigh 30(b)(6) Dep. at 62:5-9.)  Chudleigh's uses the term "Blossom Pie" and "Blossom Design" interchangeably.  In these responses, so there is no misunderstanding or unless otherwise explained, Sweet Street will use the term "Blossom Design" to cover the drawing shown in the '208 registration and the term "Blossom Pie" to describe

CONFIDENTIAL – ATTORNEY'S EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Chudleigh's various versions of its fruit filled pastry sold under its BLOSSOM word mark.

4.      On July 24, 1997, Chudleigh applied to register the Blossom Design as a trademark with the U.S. Patent and Trademark Office ("USPTO").  (Ex. 2, Trademark Application for Blossom Design, CHL00000990-998.)

> **RESPONSE**:  Admitted in part; denied in part. Denied that the application was applied for on July 24, 1997; rather, the application was applied for on October 8, 1997. (Chudleigh Ex. 2, CHL0990.)  Admitted only that the drawing in the application showed a six-fold pastry shell and not necessarily the product that Scott and Mary Chudleigh developed which was a pastry with apple filling, which Chudleigh's referred to in paragraph 3 as the Blossom Design.

5.      In response to an Office Action dated September 30, 1998, Chudleigh stated that the Blossom Design is "unusual and memorable."  (Ex. 3, Office Action response, September 30, 1998.)

> **RESPONSE**: Admitted only that Chudleigh's argued in response to a refusal by the Trademark Office to register the product configuration that the product configuration was "unusual and memorable." (Chudleigh Ex. 3, CHL 0898.)

6.      In response to an Office Action dated September 30, 1998, Chudleigh stated that it "is aware of no similar pie shape."  (Ex. 3, Office Action response, September 30, 1998.)

> **RESPONSE**:  Admitted only that Chudleigh's argued in response to a refusal by the Trademark Office to register the product configuration that it was aware of no similar pie shape (Chudleigh's Ex. 3, CHL0900) after sending a sampling of pastry recipes and photos to the Examining Attorney. As Chef Dean Lavornia explained, similar pie shapes

3

3573196.2

CONFIDENTIAL – ATTORNEY'S EYES ONLY – SUBJECT TO PROTECTIVE ORDER

existed both commercially and non-commercially at that time, and indeed for centuries prior. (Sweet Street Appendix 87, Lavornia Report.)

7.      On July 20, 1999, the USPTO issued the trademark registration for the Blossom Design.   (Ex. 4, U.S. Registration Certificate for the Blossom Design, CHL00000820-822.)

**RESPONSE**: Admitted in part; denied in part. Admitted that the USPTO issued Reg. No. 2,262,208 on July 20, 1999 for a pastry shell design that had six folds, but denied that the registration is valid.

8.      On March 31, 2005, Chudleigh filed its Sections 8 and 15 Declaration, attesting to continuous use of the Blossom Design in U.S. commerce.  (Ex. 5, Combined Declaration Under Sections 8 and 15, March 31, 2005, CHL0000999-0001004.)  In support of its Sections 8 and 15 Declaration, Chudleigh submitted a specimen. (*Id.*)

**RESPONSE**: Admitted in part; denied in part. Admitted that Chudleigh's filed a Section 8 and 15 Declaration with a Certificate of Mailing date of March 31, 2005 and that Chudleigh's submitted a specimen with that Declaration. Denied that the specimen showed the mark depicted in Reg. No. 2,262,208.

9.      On May 12, 2005, the USPTO accepted Chudleigh's Sections 8 & 15 Declaration along with its specimens and the Chudleigh Blossom Design became incontestable.  (Ex. 6, USPTO's Notice of Acceptance, May 12, 2005, CHL00000847-848.)

**RESPONSE**: Admitted in part; denied in part. Admitted only that the USPTO accepted Chudleigh's Sections 8 & 15 Declaration along with a single specimen (not specimens) and that the registration for the specific Blossom Design shown in the registration purportedly became incontestable. Denied that the specimen showed use of the mark shown in the registration.

CONFIDENTIAL – ATTORNEY'S EYES ONLY – SUBJECT TO PROTECTIVE ORDER

10.      On May 22, 2009, Chudleigh filed its Sections 8 and 9 Declaration, attesting to continuous use of the Blossom Design in U.S. commerce. (Ex. 7, Sections 8 and 9 Declaration, CHL00000834-835.)  In support of its Sections 8 and 9 Declaration, Chudleigh submitted a specimen. (*Id.*)

**RESPONSE**: Admitted in part; denied in part. Admitted only that Chudleigh's filed its Sections 8 and 9 Declaration, attesting to continuous use of the Blossom Design as covered by the registration, and submitted two specimens. Denied that the specimens showed use of the mark shown in the registration.

11.      On June 26, 2009, the USPTO accepted Chudleigh's Sections 8 and 9 Declaration (Ex. 8, Acceptance of Chudleigh's Sections 8 and 9 Declaration, CHL00000845-846.)

**RESPONSE**: Admitted in part; denied in part.  Admitted that the USPTO accepted Chudleigh's Sections 8 and 9 Declaration. Denied that the Declaration should have been accepted.

12.      Chudleigh sought and obtained a Canadian industrial design patent for its Blossom Design. (Ex. 9, Certificate of Registration for the Canadian Industrial Design, June 12, 1998, Reg. No. 84125, CHL00001024-1026.)

**RESPONSE**: Admitted in part; denied in part. Admitted only that Chudleigh's sought and obtained a Canadian industrial design registration for the design shown in Registration No. 84125. Denied that it is called an industrial design ***patent***.  Also denied that Registration No. 84125 was ever valid, as it was applied for on May 1, 1997, more than one year after the design was first used.  Chudleigh's claimed in its trademark application that it first used its design in January 1996.  Thus, pursuant to the Canadian Industrial Design Act, the industrial design registration should have been time barred. (Appendix 93,

5

3573196.2

CONFIDENTIAL – ATTORNEY'S EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Industrial Design Act, R.S.C. 1985, c. I-9 (6)(3)(a).) Notwithstanding, according to Canadian Intellectual Property Office, Registration No. 84125 is now in the "Public Domain." (Appendix 94, Canadian Intellectual Property Office Status Search Results for Reg. No. 84125.)

13.      On October 24, 2000, Chudleigh also obtained a federal trademark registration for the BLOSSOM word mark. (Ex. 10, Registration Certificate for BLOSSOM word mark, U.S. Reg. No. 2,397,934.)

**RESPONSE**: Admitted that on October 24, 2000, Chudleigh's obtained a federal trademark registration for the BLOSSOM word mark.

14.      The Blossom single-serving pie comes in two versions: hand-folded and machine-folded.  (Ex. 1, S. Chudleigh Dep. 106:1-11.)

**RESPONSE**: Admitted in part; denied in part.  Admitted that there are at least two versions of a single-serving pie product sold by Chudleigh's, and that the hand-folded version of the pie and machine-folded version of the pie look different. Denied that the cited reference supports this fact. This statement also omits the existence of the Rustic Apple Tart manufactured by Chudleigh's for US Foods, which looks different from either the "hand-folded" or "machine-folded" Blossom and Scott Chudleigh testified is covered by the '208 Registration. (Appendix 78, Scott Chudleigh 11-15-13 Individual Dep. at 22:1-22.)

15.      Since the 1990s, Chudleigh has continuously advertised and sold both the hand-folded and machine-folded Blossom Pies in U.S. commerce. (*Id.* at 69:18-70:6, 229:7-233:25, 334:17-25; Ex. 11, S. Chudleigh Dep. Exhibit 27, "Blossom Sales Figures from 1999-2012", CHL00000070, CHL00000495-496, CHL00000756-757.)

CONFIDENTIAL – ATTORNEY'S EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**RESPONSE**: Admitted in part; denied in part. Admitted that Exhibit 27 shows that Chudleigh's had sales of a hand-folded and machine-folded pastry from 1999 to the present. Denied that Chudleigh's provided support for the statement that it continuously advertised and sold both the hand-folded and machine-folded pastry since the 1990s. Scott Chudleigh merely testified that "Six folds around a round apple filling has remained the same." (Chudleigh 30(b)(6) Dep. at 70:5-6.) Denied that Exhibit 27 can be offered to support sales of any particular shaped product sold under either the headings "hand-folded" or "machine-folded."

16.    Pies with the registered Blossom Design are hand-folded and sold by Chudleigh to the food service industry in single-serving sizes of 5.6 oz. and 8.0 oz.  (Ex. 1, S. Chudleigh Dep. 145:25-146:22.)

**RESPONSE**:  Admitted in part; denied in part. Admitted that Chudleigh's has sold 5.6 oz. and 8.0 oz. hand-folded pie to the food service industry but denied that they are they are in the shape shown in the '208 registration." The packaging used for sale of the hand-folded Blossom product to the food service industry does not contain any markings providing notice of Chudleigh's claimed trademark rights in the configuration of the product. (Appendix 77, Chudleigh 30(b) Dep. at 140:9-145:4; Appendix 95, CHL319; Appendix 96, CHL823.) The products are sold through a master distributor to distributors, such as Sysco, and are packaged in bulk on a flat board with a piece of shrink wrap over the top of them, or individually wrapped; 68 to a box, in 4 layers of 17 (Chudleigh 30(b) Dep. at 132:5-24); or to restaurants directly, in 4 layers at 28 to a box (Chudleigh 30(b) Dep. at 134:17 – 135:20).  As of September 2013, Chudleigh's website did not contain

CONFIDENTIAL – ATTORNEY'S EYES ONLY – SUBJECT TO PROTECTIVE ORDER

any notice or marking indicating that the shape of the Blossom configuration was a protected trademark. (Appendix 63, Chudleigh's Website.)

17.    A true and accurate picture of Chudleigh's hand-folded Blossom Pie is below:



(Ex. 12, Picture of Hand-Folded Blossom, CHL00000159.)

**RESPONSE**:  Admitted in part; denied in part. Admitted that the picture shown in paragraph 17 looks to be a professional staged picture of Chudleigh's hand-folded pastry. Denied that the picture accurately depicts how the product looks in actual use.

18.    Chudleigh's machine-folded Blossom Pie weighs 4 oz. and is sold both to the food service industry and to retailers such as Walmart, Sam's Club, and Costco.  (Ex. 1, S. Chudleigh Dep. 120:10-19,145:25-146:8.)

**RESPONSE**:  Admitted.

19.    A true and accurate picture of Chudleigh's machine-folded Blossom Pie is below:



(Ex. 13, Picture of Machine-Folded Blossom, CHL00002502.)

8

3573196.2

CONFIDENTIAL – ATTORNEY'S EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**RESPONSE**: Admitted in part; denied in part. Admitted that the picture shown in paragraph 19 looks to be a professional staged picture of Chudleigh's machine-folded pastry. Denied that the picture accurately depicts how the product looks in actual use.

20.      To produce the machine-folded Blossom Pie, Chudleigh purchased two dough-folding machines from Form & Frys, a custom manufacturer of baking machines, one in the 1990s and another in the 2000s, and it still uses a Form & Frys machine today to make the Blossom Pies.  (Ex. 1, S. Chudleigh Dep. 72:16-74:2; and Ex. 14, Deposition of Dean Chudleigh, April 22, 2014 ("D. Chudleigh Dep.") 20:21-21:19, 25:14-25:17.)

**RESPONSE**:  Admitted only that Scott Chudleigh testified that the first Form & Frys machine was purchased in "1999, 2000" (Chudleigh Ex. 1, Chudleigh 30(b)(6) Dep. at 74:1), and Dean Chudleigh testified that the first Form & Frys machine would have been purchased in "'96, '97, or '98" and the second machine in 2008 (Chudleigh Ex.14, Dean Chudleigh Dep. at 21).

21.      In the mid-2000s, Scott Chudleigh, Chudleigh's President, told the management of Form & Frys that Chudleigh owned a patent on the shape of the Blossom Design.  (Ex. 1, S. Chudleigh Dep. at 91:10-100:15.)

**RESPONSE**:  Admitted only that Scott Chudleigh testified that both he and his brother Dean told the owner of Forms & Frys on several occasions that Chudleigh's had a patent on the Apple Blossom product (Chudleigh's Ex. 1, Chudleigh 30(b)(6) Dep. at 91:10-100:15), and admitted that Dean Chudleigh testified that he told the owner of Forms & Frys that he had a patent on the shape (Chudleigh's Ex. 14, D. Chudleigh Dep. at 33:5-17). Admitted that counsel for Chudleigh's stipulated that there is no patent in the United States or Canada and that the only alleged "patent" is not a "patent" at all, but rather a

CONFIDENTIAL – ATTORNEY'S EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Canadian Industrial Design from the 1990s. (Chudleigh's Ex. 1, Chudleigh 30(b)(6) Dep. at 94:1-96:6.) Admitted that Scott Chudleigh falsely testified that the alleged Canadian industrial design, which he referred to as a "patent," is still in existence, which it is not. (Chudleigh's Ex. 1, Chudleigh 30(b)(6) Dep. at 96:23-97:14.) Admitted that the Canadian Intellectual Property Office currently lists the status for the Canadian industrial design as "Public Domain" (Appendix 94, Canadian Intellectual Property Office Status Search Results for Reg. No. 84125). Admitted further that Reg. No. 84125 should have never issued in the first place.

22.     Chudleigh engineers periodically communicate with Form & Frys regarding replacement parts for Chudleigh's Form & Frys machine. (*Id.* at 100:16-105:2.)

**RESPONSE**: Admitted only that both Scott Chudleigh and Dean Chudleigh testified that mechanics from Chudleigh's communicate with Form & Frys about replacement parts. (Appendix 97, Dean Chudleigh Dep. at 38:13-39:2.)

23.     The only Chudleigh representatives who talk to Form & Frys with any regularity are Chudleigh engineers who need repairs or replacement parts. (*Id.*)

**RESPONSE**:  Admitted in part; denied in part.  Admitted only that both Scott Chudleigh and Dean Chudleigh testified that mechanics from Chudleigh's communicate with Form & Frys about replacement parts. (Appendix 97, Dean Chudleigh Dep. at 38:13-39:2.) Denied as to the remaining allegations in this paragraph.

24.     No one from Chudleigh has ever had any communications with Form & Frys about Sweet Street, including conversations about selling equipment to Sweet Street. (*Id.* at 104:20-105:10.)

**RESPONSE**: Denied. (*See* Sweet Street Stmt. Undisputed Facts ¶¶ 62-65.)

CONFIDENTIAL – ATTORNEY'S EYES ONLY – SUBJECT TO PROTECTIVE ORDER

25.    Chudleigh sells single-serving Blossom Pies in the U.S. food service industry. (Ex. 1, S. Chudleigh Dep. 122:24-123:24.)

**RESPONSE**:  Admitted in part; denied in part.  Admitted only that Scott Chudleigh testified at S.Chudleigh Dep. 122:24-123:24 (cited by Chudleigh's) that Chudleigh's sells its Apple Blossom product to Red Lobster. (Chudleigh 30(b)(6) Dep. at 122:24-123:24.) Denied that Chudleigh's provided support for remaining allegations in this paragraph.

26.    Wikipedia defines "Food Service" as "those businesses, institutions, and companies responsible for any meal prepared outside the home. This industry includes restaurants, school and hospital cafeterias, catering operations, and many other formats."  (Ex. 15, Printout from http://en.wikipedia.org/wiki/Foodservice.)

**RESPONSE**:  Admitted only that Exhibit 15 purports to be a printout from Wikipedia.

27.    The relevant consuming public consists not of lay consumers, but rather of professional buyers in the food service industry, that is, individuals who purchase food for restaurants, diners, coffee shops, specialty eateries and the like.  (Ex. 16, Deposition of Kelly Sholl- Krieger, December 2, 2013 ("Dep. Sholl-Krieger Dep.") 23:11-20; and Ex. 17, Rebuttal Report of Jacob Jacoby, February 14, 2014 ("Jacoby Rebuttal Report"), p. 8.)

**RESPONSE**:  Admitted in part; denied in part. Admitted that Kelly Scholl-Krieger testified that Sweet Street sells to distributors and distributors sell to the customers, including restaurants, hotels, caterers, airlines, cruise lines, and just about anybody that serves food in the food service industry (Chudleigh's Ex. 16).  Admitted that Sweet Street's Expert, Dr. Jacob Jacoby, ultimately agreed that for the purposes of Dr. Jerry Wind's report on likelihood of confusion that the intermediaries' (distributors') states of mind were the most relevant to be studied in the Wind survey. (*Compare* Jacoby Report

CONFIDENTIAL – ATTORNEY'S EYES ONLY – SUBJECT TO PROTECTIVE ORDER

(Chudleigh Ex. 17, p.8), with Appendix 98, Jacob Jacoby Dep. at 16:9-15).  Denied that

professional buyers in the food service industry are the only relevant consumers in this

case.

28.     For instance, Sweet Street's National Account Director, Kelly Sholl-Krieger,

states that Sweet Street sells to "distributors" who "sell to every restaurant, hotels, caterers,

airlines, cruise lines. Just about everyone in the food service industry."  (Ex. 16, Dep. Sholl-

Krieger Dep. 23:11-20.)

RESPONSE: Admitted.

29.     Sweet Street's expert, Jacob Jacoby, states: "Since Sweet Street would be selling

its goods to and through such intermediaries, it is these intermediaries, not the ultimate

consumer, whose states of mind is the most relevant."  (Ex. 17, Jacoby Rebuttal Report, p. 8.)

RESPONSE:  Admitted in part; denied in part.  Admitted only that for the purposes of the

Wind Report on likelihood of confusion, the intermediaries' states of mind, not the

ultimate consumer's states of mind, are the most relevant. Denied as to all other

allegations.

30.     Chudleigh's expert George Goldberg said that he "introduced the Blossom pie to

brokers in the food service industry all over the United States.  From the mid-1990s to my

retirement from the food service industry around 2010, I showed the Blossom pie to at least 30 of

the biggest brokers in the U.S."  (Ex. 18, Rebuttal Report of George Goldberg, March 17, 2014

("Goldberg Rebuttal Report"), p. 2.)

RESPONSE:  Admitted in part; denied in part.  Admitted only that Chudleigh's purported

"rebuttal" expert to the expert report of Chef Dean Lavornia testified that he "visited with

at least 30 brokers on Chudleigh's behalf." (Appendix 99, Goldberg Dep. at 164:21-22.)

12

When pressed for the names of the 30 brokers, Goldberg could only name four. (Goldberg Dep. at 164:10-22.) No other evidence was produced by Chudleigh's or Goldberg on this point.

31.     Chudleigh's expert George Goldberg states: "[W]hen I went in and showed [the brokers] the [Blossom Pie] product, they had never seen anything like it. They had nothing in the house like it, and it wasn't conflicting with anything they had." (Ex. 19, Deposition of George Goldberg, June 11, 2014 ("Goldberg Dep.") 175:15-22.)

RESPONSE:  Denied.  Goldberg's statements are pure hearsay with no way to verify the truthfulness.  Further denied on the basis of the evidence of extensive third-party use submitted by Sweet Street in support of its Motion for Summary Judgment. (Sweet Street Stmt. Undisputed Facts ¶¶ 109-110.)

32.     Chudleigh's expert George Goldberg said: "Brokers readily accepted the Blossom pie into their lineups because it was unique and they had nothing else in their portfolios that came close to the shape of the Blossom pie."  (Ex. 18, Goldberg Rebuttal Report, p. 2.)

RESPONSE:  Denied. Goldberg's statements are pure hearsay with no way to verify the truthfulness of the statement.  Moreover, Goldberg attributes "uniqueness" not to the shape of the product, but to the concept. When asked about whether the fact that the product was round make it unique, Goldberg stated "I don't – I don't really – I don't really know, you know, if one shape – this shape happened to be what we had and that was what we were – we were going to sell." (Chudleigh's Ex. 19, Goldberg Dep. at 179:7-15.)  This is yet another instance where Chudleigh's could not identify what about the shape was unique.

CONFIDENTIAL – ATTORNEY'S EYES ONLY – SUBJECT TO PROTECTIVE ORDER

33.     Sweet Street, founded by Sandra Solmon in 1978, is the leading U.S. provider of bakery products to the food service industry.  (Ex. 20, Deposition of Sandra Solmon, December 3, 2013 ("Solmon Dep.") 7:2-10:2.)

**RESPONSE**:  Admitted.

34.     Like Chudleigh, Sweet Street sells its products to the food service industry.  (Ex. 16, Sholl-Krieger Dep. 23:11-20.)

**RESPONSE**:  Admitted that Sweet Street sells its products to the food service industry and in other channels of trade. (Sweet Street Stmt. Undisputed Facts ¶ 4; Sholl-Krieger Dep. at 25:2-18.)

35.     In 2010, Sweet Street started working with Applebee's to provide Applebee's with a single-serving apple pie.  (Complaint for Declaration of Non-Infringement and for Unfair Competition, June 13, 2012, ¶ 8 (Docket No. 1) ("Complaint").)

**RESPONSE**:   Admitted that in the spring of 2010, Sweet Street started working with Applebee's to develop an individual-sized, hand-folded "apple pocket" and sent samples to Applebee's to review in July of 2010. (Sweet Street Stmt. Undisputed Facts ¶¶ 10-13.)  At the time that Sweet Street sent its samples to Applebee's for review and approval in July 2010,  the principal of Sweet Street did not even know that Chudleigh's or Chudleigh's Blossom products existed. (Appendix 102, Sandy Solmon Dep. at 41:20 – 42:5.)

36.     In October 2010, Sweet Street inquired as to whether Chudleigh would provide Sweet Street with a single serving apple pie.  (Ex. 1, S. Chudleigh Dep. 262:2-277:6; Ex. 21, S. Chudleigh Dep. Exhibit 29, "Non-Disclosure Agreement with Sweet Street".)

CONFIDENTIAL – ATTORNEY'S EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**RESPONSE**:  Denied.  In late September 2010, Sweet Street first contacted Chudleigh's about potentially producing Sweet Street's Apple Turnover product for Sweet Street. (Appendix 76, Frangakis Dep. at 30:16-31:19.) On September 28, the parties signed the Non-Disclosure Agreement (Chudleigh's Ex. 29). Thereafter, Scott Chudleigh and George Frangakis from Sweet Street had telephone discussions in which they discussed the parameters of the potential deal, including basic cost, volume and weight. (Appendix 77, Chudleigh 30(b)(6) Dep. at 271:4-17.)  Scott Chudleigh testified that during the telephone conversation with Frangakis, Frangakis told him that the project was for Applebee's so the "volume was inherent." (Chudleigh 30(b)(6) Dep. at 272:20-273:6.)

37.     In October 2010, Chudleigh sent Sweet Street samples of its Blossom Pies.  (Ex. 1, S. Chudleigh Dep. 274:8-276:7.)

**RESPONSE**:  Admitted that as part of their discussions about Chudleigh's possible co-packing the Applebee's product for Sweet Street, Chudleigh's sent samples to Sweet Street in October 2010. (Sweet Street Stmt. Undisputed Facts ¶ 23.)

38.     Chudleigh's Blossom Pie was featured on the television show "Unwrapped," with the show's host referring to Chudleigh's Blossom Design throughout the video as "patent protected."  (Ex. 20, Solmon Dep. 39:17-41:19; Ex. 22, S. Solmon Deposition Exhibit 171, "Unwrapped Video," CHL00000143 ("Patent Protected Dessert" statement at 0:25 minutes).) The host also states: "Then the artistry begins.  Chudleigh was the first to use this unique six-fold technique." (*Id.* (statement at 2:08 minutes).)  Much of the video shows and explains the manufacture of Chudleigh's hand-folded Blossom Pie.  *Id.*

**RESPONSE**:  Denied.  Scott Chudleigh says in the video "Same as your mum would do in her home. If it couldn't be done in your home, we wouldn't do it here." (Chudleigh's

15

CONFIDENTIAL – ATTORNEY'S EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Ex. 22 at 2:55 – 3:00.) Additionally, Chudleigh's did not have a U.S. patent or Canadian patent on the configuration.  It did have, at one point, a Canadian Industrial Design registration (**not** a "patent").  *See supra* ¶ 12. There is no record as to why the host stated that the dessert was "patent protected";  the only reasonable explanation is that Scott Chudleigh deliberately provided the host with false information regarding the product being covered by a "patent."

39.       In December 2010, Solmon and other Sweet Street employees gathered in Solmon's office and watched the Unwrapped Video about Chudleigh's Blossom Pie.  (Ex. 20, Solmon Dep. 29:17-32:14, 39:17-41:12 (acknowledging having watched the Unwrapped Video); Ex. 23, Solmon Dep. Exhibit 118, SSD000495 (an email acknowledging that a group of managers planned to meet in Solmon's office to view the Unwrapped Video); Ex. 24, Solmon Dep. Exhibit 167 (a computer generated calendar reminder about the scheduled meeting to watch the Unwrapped Video).)

     **RESPONSE**:  Denied.  Sandy Solmon testified that she reviewed the video that was

     available on the internet (Chudleigh Ex. 20, Solmon Dep. at 30:16-17); she did not recall

     whether anyone else viewed the video with her.  (*Id.* at 31:9-16.)

40.       Form & Frys also created a video that shows the manufacture of the machine-made Blossom Pies using Form & Frys equipment.  (Ex. 20, Solmon Dep. 35:16-37:20; Ex. 25, Solmon Dep. Exhibit 168, "Form & Frys Video".)  The Form & Frys Video does not have audio. *Id.*

     **RESPONSE**: Admitted in part; denied in part. Admitted that there is a Form & Frys video

     showing pastry products being made, but denied that it necessarily shows Blossom Pies

CONFIDENTIAL – ATTORNEY'S EYES ONLY – SUBJECT TO PROTECTIVE ORDER

being made.  Also, Sweet Street is without information to state whether the video was created by Form & Frys and therefore denies same.

41.     Solmon testified that: "Well, George Frangakis [a Sweet Street employee] found a video on the Internet that showed similar product being made and I thought well, wow, he's excited; wow, this is great, let's take a look at it and see how they do it."  (Ex. 20, Solmon Dep. 30:14-20, 37:10-20.)

RESPONSE: Denied.  Solmon testified that George Frangakis found the Unwrapped video on the Internet.  The cited page (37) testimony regards the Form & Frys video, which Ms. Solmon testified that she believed was sent to her by Rondo.  (Chudleigh Ex. 20, Solmon Dep. at 36:23-37:4.)

42.     Solmon stated that the pie was a product that "it was sort of exciting to see something like our product and see it being made. Of course. Once we were told about it, it was a product that we were committed to making a lot of units of and it was nice to see somebody doing, you know, something similar, you know.  It's great that it was on the internet."  (Ex. 20, Solmon Dep. 37:10-20.)

RESPONSE: Denied. Ms. Solmon's testimony at p. 37 referred to the Form & Frys video, sent by Rondo. (Solmon Dep. at 35:20-37:20.) When Sweet Street was considering purchasing automated folding equipment from Form & Frys and had been sent a quote for the purchase of such equipment by Rondo, Inc., the Rondo dealer, David Kollar, sent Sweet Street a video showing the operation of the Form & Frys folding equipment on March 18, 2011, so Sweet Street could evaluate it while they deliberated whether to accept the Rondo quote and submit a purchase order. (Appendix 103, SSD1750, 3-18-11

17

CONFIDENTIAL – ATTORNEY'S EYES ONLY – SUBJECT TO PROTECTIVE ORDER

email from David Kollar of Rondo to Tim Brandi of Sweet Street attaching "Hercules Tulip folder.WMV" video.)

43.     On April 4, 2011, Sweet Street employees internally circulated a copy of Chudleigh's trademark registration for Chudleigh's Blossom Design, the sender being Doug Messinger and the recipients being Sandy Solmon, Tim Brandi and Doug Messinger.  (Ex. 20, Solmon Dep. 24:23-25:15; Ex. 26, Solmon Dep. Exhibit 166, an email circulating Chudleigh's U.S. Trademark Registration for the Blossom Design dated April 14, 2011, SSD0003492-3494.)

RESPONSE:  Admitted only that when the copy of the '208 registration was circulated, Mr. Messinger observed in that email, "This is not the same as ours, ours is not continuous." (Chudleigh's Ex. 26.)

44.     Sweet Street ultimately decided to make the pie for Applebee's in Sweet Street's own facilities.  (Complaint ¶ 15 (Docket No. 1).)

RESPONSE:  Admitted that in early November 2010, Sweet Street ultimately decided to make the pie that it had developed for Applebee's, based on Applebee's directions, in Sweet Street's own facilities. (Sweet Street Stmt. Undisputed Facts ¶ 45.)  This decision was made long before Sweet Street viewed the videos referred to in paragraphs 38-42.

45.     Applebee's started selling Sweet Street's pie in its restaurants nationwide on August 15, 2011.  (Complaint ¶ 21 (Docket No. 1).)

RESPONSE:  Denied. Applebee's first started selling Sweet Street's Apple Turnover in a limited rollout from February 21, 2011 to May 22, 2011 in 27 Applebee's restaurants and ultimately launched in all of Applebee's restaurants on August 15, 2011. (Sweet Street Stmt. Undisputed Facts ¶¶ 46, 47, 72.)

18

46.     Chudleigh has protected its Blossom Design mark from infringers in the past. (Ex. 1, S. Chudleigh Dep. 322:8-324:5; Ex. 27, S. Chudleigh Exhibit 42, CHL00000221.)

**RESPONSE**: Admitted in part; denied in part.  Admitted only that Scott Chudleigh testified that he has gone after two alleged infringers in the United States in the past. Denied that Chudleigh's has "protected its Blossom Design" (whatever that means) as there are numerous third parties still manufacturing and selling apple crostata type products. (Grossberg Decl. ¶¶ 4-26; Grossberg Suppl. Decl. ¶¶ 4-5.)

47.     Chudleigh believed that it had to protect its Blossom Design mark from infringers because the mark is a crucial business asset.  (Ex. 28, Second Deposition of Scott Chudleigh, November 15, 2013 ("Second S. Chudleigh Dep.") 221:19-223:10.)

**RESPONSE**:  Denied.  If Chudleigh's was so concerned about "protecting its Blossom Design from infringers because the mark is a crucial business asset," why didn't Chudleigh's tell Sweet Street during their September-October 2011 discussions that the shape of its Blossom product was protected? Similarly, why didn't Chudleigh's tell Applebee's that the shape of its product was protected when it pitched its product to Applebee's in 2010 -2011? (Appendix 77, Chudleigh 30(b)(6) Dep. at 234:13.)  Why didn't Chudleigh's tell other third parties that it pitched its product to about Chudleigh's alleged proprietary rights in the product?  (Appendix 77, Chudleigh 30(b)(6) Dep. at 302:24-303:6 (stating that Chudleigh does not disclose alleged proprietary rights in Blossom product until "we are ready to sign a deal").) Why didn't Chudleigh's include a trademark notice in the materials submitted to Applebee's when it pitched its products? (Appendix 21, Chudleigh's "Signature Apple Dessert Ideas" for Applebee's; Chudleigh 30(b)6 Dep. at 19:17–21:21.) Why didn't Chudleigh's include any reference to its alleged

19

CONFIDENTIAL – ATTORNEY'S EYES ONLY – SUBJECT TO PROTECTIVE ORDER

protective shape on its website prior to this lawsuit? (See Appendix 63, Chudleigh's website as of September 2013, which contains no reference whatsoever to asserted trademark protection in the configuration of the Blossom product.) Why didn't Chudleigh's pursue the makers of the products shown in the 19 URL references that Paul A. Boravay, Esq., counsel for Chudleigh's, determined were not products sold by either Chudleigh's or Sweet Street? Scott Chudleigh testified that the only enforcements he could recall in the United States were against Crustie's Bakery in 2001 (Appendix 100, Chudleigh 30(b)(6) Dep. at 327:10-20) and a "misunderstanding" with Disney ten years ago that led to the Disney bakery purchasing Chudleigh's product (Appendix 101, Chudleigh 11-15-13 Individual Dep. at 189:18-193:10). Two instances of alleged enforcement in the United States over fifteen years and a systematic failure to advise third parties of its alleged rights, even when pitching its products, hardly show an effort to protect a "crucial business asset" by Chudleigh's.

48.    A few days after Applebee's began selling Sweet Street's pie, a Chudleigh employee saw the pie at an Applebee's restaurant in Buffalo, New York.  (Ex. 1, S. Chudleigh Dep. 163:23-164:10.)

RESPONSE:  Admitted that a Chudleigh's employee saw Sweet Street's Apple Turnover in an Applebee's restaurant shortly after the product launch.  This was after Scott Chudleigh saw a story on the FoodBeast website about Applebee's new cinnamon apple turnover dessert. (Sweet Street Stmt. Undisputed Facts ¶ 76.)

49.    The Chudleigh employee purchased the pie and brought it back to Chudleigh's offices where Scott Chudleigh photographed it.  (Ex. 28, Second S. Chudleigh Dep. 10:8-24; Ex. 29, Second S. Chudleigh Dep. Exhibit 44, "Pictures of Sweet Street's pie".)

CONFIDENTIAL – ATTORNEY'S EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**RESPONSE**:   Admitted only that Scott Chudleigh testified that the employee purchased the pie and brought it back to his office where he photographed it.

50.    The photograph that Scott Chudleigh took of Sweet Street's pie is below:



(Ex. 30, Color Picture of Sweet Street Pie sold at Applebee's, CHL00001072.)

**RESPONSE**:  Admitted in part; denied in part.  Admitted only that the photograph shown above is the photograph that Scott Chudleigh testified to taking.  Denied that Sweet Street sold its Apple Turnover to Applebee's with any glaze on it.

51.    Chudleigh believed that the pie infringed Chudleigh's rights in its Blossom Design trademark.  (Ex. 28, Second S. Chudleigh Dep. 24:15-25:18.)

**RESPONSE**:   Denied. To the extent Chudleigh believed this, such belief was objectively unreasonable as it looks nothing like the design shown in the '208 registration or any of the other configurations claimed by Chudleigh's to be covered under the '208 registration.

52.    On August 24, 2011, Chudleigh sent a cease-and-desist letter to Applebee's, the appropriate party because it was selling the pie.  (Ex. 1, S. Chudleigh Dep. 294:22-296:4; Exhibit 31, S. Chudleigh Dep. Exhibit 37, Cease-and-Desist Letter; Complaint ¶ 22 (Docket No. 1).)

**RESPONSE**:  Admitted in part; denied in part. Admitted that Chudleigh's sent a cease and desist letter to Applebee's, but denied that Applebee's was the appropriate party. Scott Chudleigh admitted that he knew Sweet Street was making the product for Applebee's. (Sweet Street Stmt. Undisputed Facts ¶ 80.)

CONFIDENTIAL – ATTORNEY'S EYES ONLY – SUBJECT TO PROTECTIVE ORDER

53.      Chudleigh and Applebee's settled the matter, with Applebee's agreeing to cease sales of the pie and Chudleigh permitting Applebee's to sell off its remaining inventory by the end of 2011.   (Ex. 1, S. Chudleigh Dep. 296:6-297:20.)

RESPONSE:  Admitted in part; denied in part. Admitted that Chudleigh's permitted Applebee's to sell off its remaining inventory by the end of 2011.  Denied that Applebee's agreed to permanently cease selling the Apple Turnover, given that Applebee's has on several occasions asked Sweet Street when and whether it could start selling the Apple Turnover again. (Sweet Street Stmt. Undisputed Facts ¶¶ 94-100.)

54.      Sweet Street filed this action on June 13, 2012, attacking the validity of Chudleigh's Blossom Design trademark and Chudleigh's registration for the mark, seeking a declaratory judgment of noninfringement, and alleging tortious interference.   (Complaint ¶ 1 (Docket No. 1).)

RESPONSE:  Admitted.

55.      Chudleigh counterclaimed for trademark infringement, false designation of origin and Unfair Competition under Pennsylvania Common Law.  (Chudleigh's Amended Answer, p. 10, ¶ 43-58 (Docket No. 29).)

RESPONSE:  Denied that the cited reference supports the statement of fact. Admitted that on October 2, 2013, one year and four months later, Chudleigh's filed its Amended Answer, Affirmative Defenses and Counterclaims (dkt. entry no. 51).

56.      Chef Dean Lavornia, Sweet Street's pastry expert, has been a baker since at least 1988. (Ex. 32, Deposition of Dean Lavornia, April 25, 2014 ("Lavornia Dep.") 9:7-39:13.)

RESPONSE:  Admitted.

CONFIDENTIAL – ATTORNEY'S EYES ONLY – SUBJECT TO PROTECTIVE ORDER

57.     According to Mr. Lavornia, Chudleigh's Blossom Design is a crostata, which he defines as a "piece of dough" that is "randomly rolled out" from a "small disk" to a "10 to 12 inch round disk" with a fruit or savory filling.  (Ex. 32, Lavornia Dep. 44:4-13.)

> **RESPONSE**:  Admitted that Mr. Lavornia defined a crostata as "typically a piece of dough" that "can be randomly rolled out" from a small disk to a 10-12 inch round disk, with a fruit or savory filling, and with the dough brought up and gathered around the top to contain the filling so that "it doesn't spill out over your sheet pan." (Chudleigh's Ex. 32, 44:4-18.)   Also admitted that Mr. Lavornia stated in his expert report that the shape shown in Chudleigh's Trademark Registration No. 2,262,208 "is a common pastry shape…typically referred to as a 'crostata' or 'galette' or 'free form tart.'" (Chudleigh's Ex. 33, Lavornia Expert Report, p. 5.)

58.     Mr. Lavornia states that the shape of a crostata serves several functional purposes: "[t]he upward folds function to hold in the filling, and maintain the round shape of the tart," and the fact that crostatas are open at the top allows customers to "see what type of fruit crostata they are purchasing." (Ex. 33, Expert Witness Report of Chef Dean Lavornia, November 21, 2013 ("Lavornia Report"), p.10.)

> **RESPONSE**:  Admitted.

59.     Mr. Lavornia states: "The thing that makes the crostata a crostata is taking that dough after you roll it and kind of bringing it up in pleating to hold the filling in place."  (Ex. 32, Lavornia Dep. 45:23-46:3.)

> **RESPONSE**:  Admitted.

60.     Mr. Lavornia states: "[T]he number of folds is irrelevant to the [crostata] design." (Ex. 33, Lavornia Report, p. 9-10.)

CONFIDENTIAL – ATTORNEY'S EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**RESPONSE**:  Admitted that Mr. Lavornia stated in his expert report: "Folds are commonly used when making a crostata, and the number of folds is irrelevant to the design but may be relevant to the size of the tart."  (Chudleigh's Ex. 33, Lavornia Report, p. 10.)

61.      In Mr. Lavornia's opinion, "there is nothing unique about the number of folds used [in a crostata;] a crostata could have any number of folds, including six."  (Ex. 33, Lavornia Report, p. 9-10.)

**RESPONSE**:  Admitted that Mr. Lavornia states that "there is nothing unique about the number of folds used.  Thus, a crostata could have any number of folds, including six."  (Chudleigh's Ex. 33, Lavornia Report, p. 8 (not pages 9-10 as reported by Chudleigh's).)

62.      Mr. Lavornia believes that if Chudleigh had exclusive rights in the Blossom Design, then it could stop anyone from selling any crostata whatsoever.  (Ex. 32, Lavornia Dep., 65:21-69:2; Ex. 33, Lavornia Report, p. 9-10.)

**RESPONSE**:  Admitted only that Mr. Lavornia testified as follows (Chudleigh's Ex. 32, Lavornia 66:2-68:24):

> Based on my knowledge of the baking and pastry industry and my familiarity with the crostata, in my personal opinion, no single baker can claim exclusive rights to a crostata type pastry solely on the base of the shape of the pastry. It is a shape that has been and continues to be widely used by bakers and pastry chefs.
>
> I think for somebody to try to think that they've created this shape of a pastry that's been around for so long that would be what I would think somebody's trying to get exclusive rights to this particular shape of a pastry that's been around for so long that all over the place.  So, I would say it's almost impossible for somebody to try to desire the exclusive rights to a shape that has been in existence for so long.
>
> Exclusive rights would be if I had exclusive rights to the production of this particular pastry then nobody else would be able

24

**CONFIDENTIAL – ATTORNEY'S EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

to produce it and sell it. That's my interpretation of exclusive rights. Exclusive, the nature of exclusive means narrowly limited that would be me, I would have exclusive right to the production and sale of this pastry.

I think because of the shape of that crostata, it's a crostata. It's that shape. It's the fruit in the center. It's the dough brought up and pleated to hold the fruit in place. I would think if I had the exclusive rights to that then I would have a case to say you can't produce this.

63.     For example, Mr. Lavornia explains that this eight-inch plum pastry, baked by

Mr. Lavornia himself, is a crostata:



(Ex. 33, Lavornia Report p. 6-7; Ex. 32, Lavornia Dep., 46:11-47:20.)

**RESPONSE**:  Admitted.

64.     The pie below could also be considered a crostata in Mr. Lavornia's view, and he

says it would "absolutely" be a crostata if the dough were folded over just a little more:

3573196.2

CONFIDENTIAL – ATTORNEY'S EYES ONLY – SUBJECT TO PROTECTIVE ORDER



(Ex. 33, Lavornia Report p. 6-7; Ex. 32, Lavornia Dep., (referring to Deposition Ex. 401) 60:16-23; 61:10-13.)

**RESPONSE**: Denied. When Mr. Lavornia was shown Deposition Ex. 401, which

included the above-referenced photograph, he testified as follows (Lavornia Dep. 60:11-

61:13):

> Q. Got it. Turning to the second page, please. We are still on Exhibit 401. Is there anything on that page that strikes you as a crostata?
>
> A. No. I wouldn't classify any of these as a crostata. Wait a minute, the very bottom left-hand corner, from the picture it looks like there's a little bit of that crust on the edge of the pan kind of flipped over. That could again be an interpretation. Those middle pieces when they get cut are not going to have any dough. So, it's not a classical crostata, but somebody could consider that.
>
> Q. You're talking about the rectangular thing?
>
> A. The rectangular one.
>
> Q. On the lower left-hand corner of page two?
>
> A. Yes. It's kind of a hybrid between a galette and a crostata, if you will. The arrangement of the fruit and then it looks like there's a little lip of dough from what I can see up on the edge of the pan.

3573196.2

CONFIDENTIAL – ATTORNEY'S EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Q. If somebody had maybe a half-inch more dough and flipped it over, would you then call it more clearly a crostata?

A. Absolutely.

65.     The Coca-Cola Company owns an incontestable federal trademark registration in the design of the Coca-Cola bottle.  (Ex. 34, Trademark Electronic Search System printout for the Coca-Cola bottle design, U.S. Trademark Reg. No. 1,057,884.)

**RESPONSE**:  Admitted only that Exhibit 34 shows a printout from the Trademark Electronic Search System for the Coca-Cola bottle.

66.     Section 1604.13 of the Trademark Manual of Examining Procedure ("TMEP") states: "The mark to which the §8 affidavit or declaration pertains must be essentially the same as the mark that appears in the registration." (Ex. 35, TMEP Section 1604.13, "Differences in the Mark as Used on the Specimen and the Mark as Registered.")

**RESPONSE**:  Admitted only that Exhibit 35 is a printout of Section 1604.13 from the Trademark Manual of Examining Procedure.

Dated:  July 25, 2014

Respectfully submitted,

/s/ Nancy Rubner Frandsen
Nancy Rubner Frandsen
Jacqueline M. Lesser
Lesley M. Grossberg
BAKER & HOSTETLER
nfrandsen@bakerlaw.com
jlesser@bakerlaw.com
lgrossberg@bakerlaw.com
2929 Arch Street, Cira Centre 12th Floor
Philadelphia, Pennsylvania  19104
Telephone:  (215) 564-1223
Facsimile:  (215) 568-3349

*Attorneys for Plaintiff,*
*Sweet Street Desserts, Inc.*

27