# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **SWEET STREET DESSERTS, INC.**<br><br>v.<br><br>**CHUDLEIGH'S LTD.** | **CIVIL ACTION**<br><br>**NO. 12-3363** |

## MEMORANDUM RE SUMMARY JUDGMENT

**Baylson, J.**                                                         **December 23, 2014**

This case presents the delicious issue, sure to please those with a sweet tooth, of whether summary judgment should be granted to either side in a trademark infringement dispute over apple pastry desserts. Plaintiff Sweet Street Desserts, Inc. ("Sweet Street") manufactured an apple turnover sold at Applebee's restaurants that Defendant Chudleigh's Ltd. ("Chudleigh's") contends infringed its registered product configuration trademark in the design of Chudleigh's Apple Blossom pie (the "Blossom Design").[1] Both sides have moved for summary judgment. Sweet Street seeks summary judgment on its claims for a declaratory judgment of non-infringement, cancellation of Chudleigh's trademark registration, and tortious interference, as well as on Chudleigh's counterclaims. Chudleigh's seeks summary judgment on all of Sweet Street's claims except non-infringement.

Both sides were ably represented by counsel, who provided the Court with a fully baked factual record and excellent arguments in support of their positions. The parties are largely in agreement on the underlying facts, although they dispute certain factual and legal inferences that can be drawn from them. Ultimately, this case bakes down to the question of whether

---

[1] The parties have numerous labels for the products at issue, including turnovers, pies, crostatas, galettes, and tarts. In advertising the Blossom product, Chudleigh's noted that "[i]n Italy it would be a CROSTATA, in France a GALETTE, and they would all be flaky pastry folded around slices of fresh apples and spices" (Pl. SOF ¶ 137). The Court will refer to Sweet Street's product as an apple turnover and Chudleigh's product as the Blossom.

Chudleigh's Blossom Design trademark, which covers a round, single-serving, fruit-filled pastry with six folds or petals of upturned dough, is functional, and, accordingly, not protectable as a trademark or trade dress.  See TrafFix Devices, Inc. v. Mktg. Displays, Inc., 532 U.S. 23, 32-33 (2001) (noting functional product design features are not protectable as trademarks or trade dress).

The Court concludes that there is no genuine dispute of material fact as to the functionality of Chudleigh's Blossom Design and will grant summary judgment in favor of Sweet Street on this issue.  The Blossom Design "is essential to the use or purpose of the article" and "affects the cost or quality of the article."  TrafFix, 532 U.S. at 32 (internal quotation marks and citation omitted).  The product's size, shape, and six folds or petals of upturned dough are all essential ingredients in the Blossom's ability to function as a single-serving, fruit-filled dessert pastry.  The six folds or petals of upturned dough are essential to contain the filling, and the number of folds or petals is determined in part by the size of the product and the need to limit the number of openings in the top for re-heating.  Furthermore, permitting Chudleigh's to maintain proprietary rights in the Blossom Design would have the deleterious impact on competition that the functionality doctrine aims to prevent.  See TrafFix, 532 U.S. at 29; see also Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 213 (2000) (cautioning against the overextension of trade dress because "product design almost invariably serves purposes other than source identification").[2]

The Court also concludes, however, that Chudleigh's is entitled to summary judgment on Sweet Street's tortious interference claims.  Because Sweet Street has failed to show that Chudleigh's sending of a cease-and-desist letter to Applebee's regarding Applebee's sale of

---

[2] The Court's decision will not deprive Chudleigh's of all proprietary rights in the Blossom product.  Chudleigh's has a registered federal trademark for the BLOSSOM word mark, which is not at issue in this case.

Sweet Street's turnover was a "sham," Chudleigh's conduct in sending the cease-and-desist letter is immunized under the <u>Noerr-Pennington</u> doctrine. Sweet Street has also failed to show a genuine dispute of material fact about whether Chudleigh's pressured bakery equipment manufacturer Form & Frys not to sell a dough-folding machine to Sweet Street.

## I. Background

### A. Factual Summary

The facts underlying this case are largely undisputed.

On January 20, 1999, the United States Patent and Trademark Office ("PTO") issued Chudleigh's trademark registration No. 2,262,208 for the Blossom Design as a "distinctive configuration for baked goods" (Def. Statement of Undisputed Facts ("SOF") ¶ 7). The drawing of the product configuration submitted with the trademark application and entered on the principal register of the PTO is as follows.



On October 24, 2000, Chudleigh's obtained a federal trademark registration for the BLOSSOM word mark (<u>id.</u> ¶ 13).

On May 12, 2005, the PTO accepted Chudleigh's Sections 8 and 15 Declaration attesting to continuous use of the Blossom Design in U.S. commerce and supporting specimens, and the Blossom Design became incontestable (<u>id.</u> ¶ 9). The parties agree that there are at least two versions of the Blossom Design, the hand-folded version and the machine-folded version,

although they dispute which versions Chudleigh's trademark registration covers. Both versions are depicted as follows:

Hand-Folded Blossom          Machine-Folded Blossom

 

On June 26, 2009, the PTO accepted Chudleigh's Sections 8 and 9 Declaration attesting to continuous use of the Blossom Design in U.S. commerce (id. ¶ 11).

In the spring of 2010, Applebee's contacted Sweet Street to express interest in having Sweet Street manufacture an apple dessert for Applebee's (Pl. SOF ¶¶ 10, 189). In July 2010, after several discussions between Applebee's and Sweet Street, Sweet Street sent samples of an apple dessert to Applebee's (id. ¶¶ 12, 190). Applebee's liked the product, so Sweet Street began to investigate manufacturing the apple dessert, including the possibility of "outsourcing"[3] its production (id. ¶ 15).

In September 2010, Sweet Street Channel Marketing Manager George Frangakis spoke with Chudleigh's President Scott Chudleigh about potential outsourcing (id. ¶ 21-22). On September 28, 2010, Frangakis and Chudleigh signed a mutual non-disclosure agreement, and they discussed pricing, options, and potential volumes (id. ¶ 24). In early October, Chudleigh's provided samples of its Blossom product to Sweet Street (id. ¶ 23; Def. SOF ¶ 37). During this time, the evidence indicates Chudleigh's learned the customer "was Applebee's and . . . the

---

[3] Some undisputed facts show Sweet Street first approached a third party named Coastal Foods to discuss outsourcing (Pl. SOF ¶ 17-20). The record evidence then shows Sweet Street approached Chudleigh's to discuss the possibility of Chudleigh's manufacturing the apple dessert Sweet Street was to provide to Applebee's, an arrangement the parties described as "co-packing."

volume is inherent" (Pl. SOF ¶ 25). The evidence indicates Chudleigh's did not inform Sweet Street of Chudleigh's trademark registration at the time the parties discussed possible outsourcing and Chudleigh's sent samples to Sweet Street (id. ¶¶ 26, 33-34).

Sweet Street decided not to outsource manufacture of the apple dessert to Chudleigh's, but the parties dispute the subsequent course of events. Sweet Street contends it rejected outsourcing to Chudleigh's because Chudleigh's product looked different than the turnover Sweet Street had developed for Applebee's, and Sweet Street decided to manufacture the turnover at its Reading, Pennsylvania, plant (id. ¶¶ 27-32, 45). Chudleigh's position is that Sweet Street misappropriated Chudleigh's Blossom Design and created an infringing product (Def. SOF ¶¶ 35-45).

On October 22, 2010, Applebee's gave Sweet Street the green light to produce 165 cases of "Apple Pocket" (Pl. SOF ¶ 41). The Apple Pocket was renamed the Apple Turnover and was successfully tested in a limited rollout in 27 Applebee's restaurants from February 21, 2011, to May 22, 2011 (id. ¶¶ 46-49).

In anticipation of the need to ramp up production of the Apple Turnover, Sweet Street contacted Rondo, Inc.,[4] a seller of bakery and food processing equipment, to source automation equipment for making, cutting, and folding pastry dough (id. ¶ 50). Between November 2010 and February 2011, Rondo contacted Danish baking equipment company Form & Frys about obtaining folding machinery for Sweet Street to manufacture the Apple Turnover (id. ¶ 51). Although Form & Frys indicated as early as February 2011 that there might be issues regarding

---

[4] Much of the evidence Sweet Street provides regarding the discussions with Rondo comes from the Declaration of Jerry Murphy, President of Rondo. See ECF No. 80, Ex. 3, Murphy Dec. Although Chudleigh's objects to Sweet Street's reliance on the Murphy Declaration on the ground that Sweet Street failed to produce it and provide Chudleigh's an opportunity to depose or cross-examine Murphy, Chudleigh's does not dispute that Sweet Street approached Rondo (Def. Response to Pl. SOF ¶ 50). Moreover, there is documentary evidence in the record attesting to the business relationship between Sweet Street and Rondo. See ECF No. 83, Ex. 29-31, 33-38; ECF No. 80, Murphy Dec., Ex. A.

"exclusives" or a "patent" on either the machinery or the product it produced, Form & Frys sent Rondo a proposal to sell a Hercules dough-folding machine to Sweet Street (id. ¶ 52). Rondo provided an initial quote to Sweet Street for a baking system that included a Hercules machine on March 8, 2011, and a revised quote on March 29, 2011 (id. ¶ 56-57). Sweet Street submitted a purchase order for the Hercules machine to Rondo (id. ¶ 59).

The parties do not dispute that Form & Frys rejected the quote and would not sell the Hercules machine to Sweet Street (id. ¶¶ 61-63). The evidence indicates that Form & Frys rejected the quote because it understood Chudleigh's to have a "patent" and exclusivity in the shape of the pastry formed by the Hercules machine (id. ¶¶ 62-63; Def. SOF ¶ 21). Sweet Street suggests Chudleigh's misrepresented Chudleigh's proprietary rights in the Blossom Design to Form & Frys and called Form & Frys to pressure it not to do business with Sweet Street (Pl. SOF ¶¶ 64-66). Chudleigh's disputes these allegations and argues there is no factual evidence in the record to support Sweet Street's inferences (Def. SOF ¶¶ 21-24; Def. Supp. SOF ¶¶ 11-15).

On August 15, 2011, Applebee's launched Sweet Street's Apple Turnover as a limited time offer, and Sweet Street expected the Apple Turnover to become a core menu item (Pl. SOF ¶ 73-75). Sweet Street did not have a written, long-term contract with Applebee's. See ECF No. 102, Pl. Supp. Submission. However, Sweet Street contends a written contract was not necessary under the U.C.C. because Sweet Street's arrangement with Applebee's was one of open quantity and exclusivity. As evidence that Sweet Street had a contractual relationship with Applebee's, Sweet Street points to evidence in the record including the Demand Plan, which anticipated a quantity of no less than four Apple Turnovers per restaurant per day, the fact that the Apple Turnover was "close coded," meaning it was exclusive to Applebee's, and the parties

course of dealing relating to the development and launch of the Apple Turnover. See ECF No. 102, Pl. Supp. Submission. Chudleigh's contends the record contains no evidence that Chudleigh's ever knew of any contract between Sweet Street and Applebee's. See ECF No. 101, Def. Supp. Submission.

On August 16, 2011, Scott Chudleigh noticed a story on the FoodBeast website about Applebee's new Apple Turnover, and wrote in an email to a Chudleigh's employee, "[L]ooks pretty close to the trade mark. I will look for the actual product and take a picture, but probably send to lawyer?" (Pl. SOF ¶¶ 76, 188). Shortly afterwards, a Chudleigh's employee bought the Apple Turnover at an Applebee's in Buffalo, New York, and brought it to Scott Chudleigh, who took pictures of it and sent them to his lawyers (id. ¶¶ 77-78, 187; Def. SOF ¶¶ 48-50). Here is one of the photos Scott Chudleigh took:



On August 24, 2011, Chudleigh's counsel sent a cease-and-desist letter to Applebee's (Pl. SOF ¶ 79; Def. SOF ¶ 52). This letter claimed that Applebee's new dessert was likely to cause confusion among customers that Applebee's was selling Chudleigh's product and that Applebee's sale of the product in its restaurants constituted trademark infringement, unfair competition, false designation of origin, and unfair and deceptive trade practices (Pl. SOF ¶ 83). The parties dispute whether Chudleigh's knew Sweet Street was the supplier of the Apple Turnover when Chudleigh's sent the cease-and-desist letter to Applebee's (id. ¶ 80; Def. Response to Pl. SOF ¶ 80).

Chudleigh's permitted Applebee's to sell the remaining inventory of the Sweet Street turnover it had in stock. When Scott Chudleigh communicated with Applebee's about the sale of this remaining inventory in September 2011, he wrote, "If the product is to hit the menu again, you will be in touch with us to discuss how we can move forward together. Thank you for considering our marks, and hope we can bring value to Applebee's in the future." (Pl. SOF ¶ 86).

## B. Procedural History

On June 12, 2012, Sweet Street filed a nine-count Complaint seeking the following relief:

1. Counts I—Declaratory judgment of non-infringement of Chudleigh's trademark registration;

2. Count II – Declaratory judgment that Chudleigh's trademark registration is invalid because the registration is for a generic tart shape;

3. Count III – Cancellation of Chudleigh's trademark registration as generic;

4. Count IV – Cancellation of Chudleigh's trademark registration as obtained by fraud;

5. Count V – Cancellation of Chudleigh's trademark registration as abandoned;

6. Count VI – Tortious interference with actual and prospective contractual relations with Applebee's;

7. Count VII – Tortious interference with prospective contractual relations with Form & Frys;

8. Count VIII – Violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"); and

9. Count IX – Breach of mutual nondisclosure agreement.

On October 10, 2012, Chudleigh's moved to dismiss Sweet Street's complaint pursuant to Fed. R. Civ. P. 12(b)(1) for lack of jurisdiction and Fed. R. Civ. P. 12(b)(6) for failure to state a claim (ECF No. 6). Chudleigh's argued that Sweet Street failed to allege an actual controversy to support the Court's jurisdiction over its declaratory judgment claims, and, absent an actual controversy, the Court could not consider Sweet Street's requests for cancellation of Chudleigh's

trademark registration in Counts III, IV, and V.  Chudleigh's moved to dismiss Sweet Street's state law claims on various Rule 12(b)(6) grounds, including that Chudleigh's cease-and-desist letter was protected activity under the <u>Noerr-Pennington</u> doctrine and could not be the basis of a tortious interference claim.  Sweet Street opposed Chudleigh's motion (ECF No. 14), and Chudleigh's replied (ECF No. 15).

Following oral argument on these issues on March 5, 2013, the Court denied Chudleigh's motion to dismiss most of Sweet Street's claims in a Memorandum (ECF No. 23) and Order (ECF No. 24) issued April 4, 2013.  <u>See</u> <u>Sweet Street Desserts, Inc. v. Chudleigh's Ltd.</u>, No. 12-3363, 2013 WL 1389760 (E.D. Pa. Apr. 4, 2013).  The Court concluded that because Sweet Street and Chudleigh's had adverse legal interests in an immediate, real dispute, an actual controversy existed, giving the Court jurisdiction over Sweet Street's declaratory judgment claims (Counts I and II) and cancellation of trademark registration claims (Counts III, IV, and V).  The Court denied Chudleigh's motion to dismiss the tortious interference claim involving Applebee's (Count VI) because Sweet Street established a sufficient factual basis for the plausible inference that Chudleigh's cease-and-desist letter was a "sham" unworthy of constitutional protection under <u>Noerr-Pennington</u>.  The Court also denied Chudleigh's motion regarding the tortious interference claim involving Form & Frys (Count VII), finding that Sweet Street's Complaint asserted a plausible claim for relief.  However, the Court dismissed Sweet Street's UTPCPL and breach of non-disclosure agreement claims (Counts VIII and IX) under Rule 12(b)(6) for failure to state a claim.

On July 2, 2013, Chudleigh's moved to file an amended answer and to add affirmative defenses and counterclaims (ECF No. 29).  Sweet Street opposed Chudleigh's motion on grounds of undue delay and prejudice to Sweet Street (ECF No. 32), and Chudleigh's replied

(ECF No. 42). On September 27, 2013, the Court issued a Memorandum (ECF No. 49) and Order (ECF No. 50) granting Chudleigh's leave to file an amended answer with counterclaims. See Sweet Street Desserts, Inc. v. Chudleigh's Ltd., No. 12-3363, 2013 WL 5467962 (E.D. Pa. Sept. 27, 2013).

On October 2, 2013, Chudleigh's filed its amended answer (ECF No. 51) and asserted three counterclaims against Sweet Street:

1. Count I -- Trademark infringement in violation of 15 U.S.C. § 1114;

2. Count II -- False designation of origin in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); and

3. Count III -- Violations of state unfair competition law.

After discovery, on June 30, 2014, both parties filed motions for summary judgment, including statements of undisputed facts as required by the Court's procedures.

Chudleigh's moved for summary judgment (ECF No. 65) on all of Sweet Street's claims except non-infringement (Count I) and filed a memorandum of law in support of its position (ECF No. 69). Chudleigh's contends the facts show its Blossom design is not functional or generic, Chudleigh's has not abandoned use of the registered trademark, and there is no evidence the trademark registration was obtained fraudulently. Chudleigh's argues the tortious interference claim involving Applebee's should be barred by Noerr-Pennington because no facts in the record establish that Chudleigh's cease-and-desist letter was a "sham." Chudleigh's also claims no facts in the record support Sweet Street's allegation of tortious interference with prospective contractual relations with Form & Frys. Sweet Street responded to Chudleigh's motion (ECF No. 81), and Chudleigh's replied (ECF No. 71).

Sweet Street moved for summary judgment on all claims, including Chudleigh's counterclaims (ECF No. 67), and filed a memorandum of law in support of its position (ECF No.

80). Sweet Street contends Chudleigh's does not have a valid and protectable mark in the Blossom design because the facts show that (i) Chudleigh's Blossom design is functional, generic, and insufficiently identified; (ii) Chudleigh's abandoned the configuration depicted in its trademark registration; and (iii) Chudleigh's procured the trademark through fraud on the PTO. Sweet Street also argues that, if the Court concludes Chudleigh's has protectable trade dress, the facts show that the trade dress lacks secondary meaning and there is no likelihood of confusion. With regard to the tortious interference claim involving Applebee's, Sweet Street contends the "sham" exception to Noerr-Pennington applies because Chudleigh's knew that Sweet Street made the apple turnover yet Chudleigh's wrote to Applebee's, Sweet Street's customer, and Chudleigh's should have known it did not have the trademark protection Chudleigh's asserted in the cease-and-desist letter. With regard to the tortious interference claim regarding Form & Frys, Sweet Street contends the facts demonstrate that Chudleigh's precipitated Form & Frys's allegedly "abrupt" refusal to sell the Hercules dough-folding machine to Sweet Street. Chudleigh's responded to Sweet Street's motion (ECF No. 70) and to Sweet Street's memorandum of law (ECF No. 76). Sweet Street replied (ECF No. 82).

On August 20, 2014, Chudleigh's moved (ECF No. 86) to strike Sweet Street's advice of counsel defense, which was raised for the first time in Sweet Street's reply brief in support of its motion for summary judgment (ECF No. 82), on the grounds that Sweet Street had waived this defense and it would be unfair to Chudleigh's to permit Sweet Street to assert it. Sweet Street opposed Chudleigh's motion (ECF No. 87), arguing it raised the advice of counsel defense only after Chudleigh's raised the issue of alleged willful infringement for the first time in its opposition to Sweet Street's motion for summary judgment. Chudleigh's replied that Sweet

Street was incorrect because the parties discussed the issue of intent/deliberate disregard in all of their summary judgment briefs in the context of the likelihood of confusion test (ECF No. 90).

On September 22, 2014, Chudleigh's submitted supplemental briefing (ECF No. 91) contending that an intervening appellate decision, Fair Wind Sailing, Inc. v. Dempster, 764 F.3d 303 (3d Cir. 2014), had changed trade dress law in the Third Circuit by requiring a party to state with particularity the specific elements of its trade dress. As a result, Chudleigh's defined its trade dress as containing the following elements:

1. A single-serving dessert item;

2. A round shape;

3. Six folds or petals of dough;

4. Such folds or petals being folded upward and around a filling;

5. Such upward folding resulting in the folds or petals partially overlapping each other;

6. Such upward folding yielding a regular spiral pattern resembling the shape of a blossom; and

7. Such upward folding leaving an opening at the top.

Sweet Street responded that Fair Wind Sailing did not change Third Circuit trade dress law and that Chudleigh's defined trade dress is made up of vague and usual shapes that are not protectable as a trademark (ECF No. 94). Chudleigh's filed a reply (ECF No. 95).

The Court held oral argument on the parties' summary judgment motions on December 2, 2014. During the oral argument, Sweet Street indicated it was abandoning its claims that Chudleigh's obtained its trademark by fraud (Count IV) and abandoned its trademark (Count V). See ECF No. 103, Hr'g Tr. 55:8-18, 60:25-61:10, 85:12-13, Dec. 2, 2014. The Court also invited supplemental submissions from the parties on certain factual and legal issues raised

during the hearing.  On December 8, 2014, Sweet Street (ECF No. 102) and Chudleigh's (ECF No. 101) filed their supplemental submissions, which the Court has reviewed.

## II. Analysis

### A. Summary Judgment

A district court should grant a motion for summary judgment if the movant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it "might affect the outcome of the suit under the governing law."  Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case."  Id. at 325. After the moving party has met its initial burden, the adverse party's response must, "by affidavits or as otherwise provided in this rule [ ] set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e).  Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.  Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party.  Anderson, 477 U.S. at 255.

**B. Trade Dress and Registration as a Trademark**

**1. Legal Standards**

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), prohibits the use of "any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin" that is "likely to cause confusion, or to cause mistake, or to deceive . . . as to the origin, sponsorship, or approval of his or her goods." 15 U.S.C. § 1125(a). Section 43(a) includes protection for a party's "trade dress," which "has been defined as the total image or overall appearance of a product, and includes, but is not limited to, such features as size, shape, color or color combinations, texture, graphics, or even a particular sales technique," and is the "overall look of a product or business." Fair Wind Sailing, Inc. v. Dempster, 764 F.3d 303, 308 (3d Cir. 2014) (quoting Rose Art Indus., Inc. v. Swanson, 235 F.3d 165, 171 (3d Cir. 2000)). "[T]rade dress protection extends only to incidental, arbitrary or ornamental product features which identify the product's source." Id. at 309 (quoting Shire U.S. Inc. v. Barr Labs., Inc., 329 F.3d 348, 353 (3d Cir. 2003)). The Court is also mindful that the Supreme Court has cautioned against the overextension of trade dress. See TrafFix, 532 U.S. at 29; see also Wal-Mart Stores, 529 U.S. at 213 (cautioning against the overextension of trade dress because "product design almost invariably serves purposes other than source identification").

To establish unregistered trade dress infringement under the Lanham Act, a party must prove that (1) the allegedly infringing design is non-functional; (2) the design is inherently distinctive or has acquired secondary meaning; and (3) the alleged infringer's use of the mark is likely to create confusion regarding the origin of the goods or services. Fair Wind Sailing, 764 F.3d at 309 (citing McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC, 511 F.3d 350, 357

(3d Cir. 2007)).  In addition to these factors, the party claiming trade dress protection must also articulate the specific elements of its trade dress.  Id.

Trade dress may be registered on the Principal Register of the PTO.  Aromatique, Inc. v. Gold Seal, Inc., 28 F.3d 863, 868 (8th Cir. 1994).  Registration of trade dress as a trademark confers certain benefits on its owner:

1. Registration provides a party with a right of action under 15 U.S.C. § 1114 for infringement of a registered trademark.  See id.; 1 McCarthy on Trademarks and Unfair Competition §§ 8:1, 8:7 (4th ed.) ("Today, many types of designations protectable as 'trade dress' are also registerable as 'trademarks.'").

2. Registration is prima facie evidence of the validity of the mark, the owner's ownership of the mark or trade dress, and the owner's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate.  15 U.S.C. §§ 1057(b), 1115(a).  Accordingly, registration of the mark creates a presumption of non-functionality and secondary meaning.  See 1 McCarthy on Trademarks § 7:72 ("If plaintiff has a federally registered trademark or service mark in the design feature, the burden of proof on functionality shifts to defendant, for a registration is at least prima facie evidence of validity.").

3. Registration provides constructive notice of the registrant's claim of ownership of the mark.  15 U.S.C. § 1072; Natural Footwear Ltd. v. Hart, Schaffner & Marx, 760 F.2d 1383, 1395 (3d Cir. 1985).

4. Registration may also lead, if certain conditions are met, to the mark becoming incontestable if it has been in continuous use for five consecutive years and is still in use in commerce.  15 U.S.C. § 1065.

But registration does "not preclude another person from proving any legal or equitable defense or defect … which might have been asserted if such mark had not been registered." Id. § 1115(a). One such defense or defect is that the mark is functional. Id. § 1115(b). A registered trademark is always subject to cancellation as functional. Id. § 1064(3). An incontestably registered mark is also subject to cancellation as functional. Id. §§ 1064(3), 1065, 1115(b); 1 McCarthy on Trademarks §§ 7:72, 7:84.

**2. The Scope of Chudleigh's Trademark**

Chudleigh's Blossom Design is trade dress that is registered as a trademark on the principal register of the PTO, and the registered Blossom Design trademark has become incontestable. However, the parties dispute the scope of Chudleigh's trademark registration. It is undisputed that Chudleigh's manufactures and sells at least two versions of the Blossom product in U.S. commerce—the hand-folded version and the machine-folded version.

Chudleigh's contends the Blossom Design trademark registration covers both versions of the Blossom product. See ECF No. 103, Hr'g Tr. 8:15-17, Dec. 2, 2014. Chudleigh's argues that the drawing accompanying the trademark registration represents the hand-folded version of the Blossom product, and the PTO subsequently accepted specimens of the machine-folded version submitted with Chudleigh's renewal applications as "essentially the same" as the hand-folded version. See id. 7:21-8:14.[5]

Sweet Street argues that Chudleigh's trademark registration extends only to the product depicted in the drawing accompanying the Blossom design's trademark registration. See id. 13:1-5. Sweet Street contends neither the hand-folded nor the machine-folded version looks like the drawing accompanying Chudleigh's registration. Sweet Street's position would leave

---

[5] In the alternative, Chudleigh's argues the registered trademark covers the hand-folded version, and Chudleigh's claims unregistered trade dress rights in the machine-folded version. See ECF No. 103, Hr'g Tr. 8:20-9:2, Dec. 2, 2014.

Chudleigh's with unregistered trade dress rights in both the hand-folded and machine-folded versions of the Blossom.[6]

The scope of Chudleigh's trademark registration is important because it has a burden-shifting impact on the issue of functionality. If the trade dress is unregistered, the party claiming unregistered trade dress rights bears the burden of proving the trade dress is non-functional. 15 U.S.C. § 1125(a)(3). Accordingly, if Chudleigh's has only unregistered trade dress rights in one or both versions of the Blossom, Chudleigh's would bear the burden of showing non-functionality. If the trade dress is registered as a trade mark, however, the registration is prima facie evidence of validity and non-functionality, shifting the burden of showing that the registered trademark is functional to the accused infringer. 1 McCarthy on Trademarks §§ 7:72; 8:1. Accordingly, if Chudleigh's has a registered trademark in one or both versions of the Blossom, Sweet Street would bear the burden of showing Chudleigh's registered mark is functional.

Solely for the purpose of ruling on the parties' pending summary judgment motions, the Court will assume without deciding that Chudleigh's registered trademark in the Blossom Design covers both the hand-folded and machine-folded versions. This assumption has the effect of placing the burden of proving the functionality of Chudleigh's trademark on Sweet Street. The Court imposes this burden on Sweet Street because, if Sweet Street is able to show Chudleigh's Blossom Design is functional, then Chudleigh's trademark registration would be invalid and

---

[6] In the alternative, Sweet Street contends that Chudleigh's trademark registration only applies to the hand-folded version, not the machine-folded version. See id. 73:9-17.

Chudleigh's would be unable to meet the burden of showing the non-functionality of any claimed unregistered trade dress rights.[7]

## C. Functionality

### 1. Legal Standards

As noted, functionality is a defense to infringement of a registered trademark, even if that mark has become incontestable. The functionality doctrine aims to preserve competition. TrafFix, 532 U.S. at 29 (noting "[t]rade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products"). The doctrine enhances competition by policing the boundary between trademark and patent protection. Id. at 34 ("The Lanham Act does not exist to reward manufacturers for their innovation in creating a particular device; that is the purpose of the patent law and its period of exclusivity."). Functionality also ensures that the first to develop a useful product feature or design cannot exclude others "simply because an investment has been made to encourage the public to associate a particular functional feature with a single manufacturer or seller." Id. at 34-35.

In TrafFix, the Supreme Court set forth a two-step test for determining functionality. First, a product feature is functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." TrafFix, 532 U.S. at 32 (quoting Qualitex Co. v. Jacobson Prods. Co., 514 U.S. 159, 165 (1995) and Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 850 n.10 (1982)). The key question, as formulated by the Third Circuit, is "whether a particular feature of a product or service is substantially related to its value *as a product or service, i.e.*, if the feature is part of the function served, or whether the primary value of a particular feature is the identification of the provider." Am. Greetings Corp. v. Dan-Dee

---

[7] Because the Court assumes without deciding that Chudleigh's trademark registration covers both the hand-folded and machine-folded versions of the Blossom product, the Court makes no finding of fact on the scope of Chudleigh's trademark registration.

Imports, Inc., 807 F.2d 1136, 1142 (3d Cir. 1986) (internal quotation marks and citation omitted).  A feature that is "incidental, arbitrary or ornamental" is not functional.  Fair Wind Sailing, 764 F.3d at 309.

Where the product feature is functional under this test, there is no need to proceed to the second step of the analysis.  TrafFix, 532 U.S. at 33.  However, if the functionality of the product feature cannot be determined under the first step, courts then evaluate whether the feature "is one the 'exclusive use of [which] would put competitors at a significant non-reputation-related disadvantage.'"  Id. at 32 (quoting Qualitex, 514 U.S. at 165).  The Court indicated that the second test applies where "esthetic functionality" is the central question.  Id. at 33.  Under the doctrine of aesthetic functionality, visually attractive and pleasing designs are considered to be functional if they are important to the commercial success of the product.  See 1 McCarthy on Trademarks § 7:79.  However, the Third Circuit has narrowed the application of the aesthetic functionality theory by insisting that a feature must be "significantly related to the utilitarian function of the product" to be functional.  Keene Corp. v. Paraflex Indus., Inc., 653 F.2d 822, 825 (3d Cir. 1981).  The Third Circuit's limitation on aesthetic functionality was not before the Court in TrafFix, and there is no basis in that decision for considering Keene overruled.

If a product feature or design is found to be functional, courts need not engage in speculation about other possible ways of configuring the feature or design.  TrafFix, 532 U.S. 32 (holding the Court of Appeals should not have engaged in speculation about other design possibilities for a dual-spring mechanism that a competitor could have used because the dual-spring mechanism was functional).

In addition, one may have a protectable interest in a combination of features or elements that includes one or more functional features.  Am. Greetings, 807 F.2d at 1143 ("[V]irtually

every product is a combination of functional and non-functional features and a rule denying protection to any combination of features including a functional one would emasculate the law of trade dress infringement.").  Accordingly, "[w]hen the thing claimed as trade dress or a trademark consists of a combination of individual design features, then it is the functionality of the overall combination that controls."  1 McCarthy on Trademarks § 7:76.

## 2. Functionality Determination on Summary Judgment

The Third Circuit has held that functionality is a question of fact.  See Shire US Inc. v. Barr Labs, Inc., 329 F.3d 348 (3d Cir. 2003); Ciba-Geigy Corp. v. Bolar Pharma. Co., Inc., 747 F.2d 844, 850 (3d Cir. 1984); see also McCarthy on Trademarks § 7:71 ("All courts have held that the enquiry as to functionality is a question of fact.").  Courts have divided over whether it is appropriate to grant summary judgment on the question of functionality, as evidenced by the following chart containing a sample of functionality decisions:

| Case | Product | Outcome |
| --- | --- | --- |
| TrafFix Devices, Inc. v. Mktg. Displays, Inc., 532 U.S. 23 (2001) | Visible dual-spring mechanism used in temporary traffic signs | Reversing Sixth Circuit's denial of summary judgment on functionality because Sixth Circuit failed to give proper weight to expired utility patent and used wrong legal standard of functionality. |
| Keene Corp. v. Paraflex Indus., Inc., 653 F.2d 822, 825 (3d Cir. 1981) | Wall-mounted luminaire | Affirming denial of preliminary injunction because product was functional. |
| U.S. Golf Ass'n v. St. Andrews Sys., Data-Max, Inc., 749 F.2d 1028 (3d Cir. 1984) | Formula for computerized golf handicapping system | Affirming summary judgment on functionality because plaintiff failed to raise a factual issue of formula's functionality. |
| Am. Greetings Corp. v. Dan-Dee Imports, Inc., 807 F.3d 1136 (3d Cir. 1986) | Tummy graphics on Care Bears | Affirming district court's finding of functionality and vacating preliminary injunction. |
| Shire US Inc. v. Barr Labs, Inc., 329 F.3d 348 (3d Cir. 2003) | Medicine tablets | Affirming denial of preliminary injunction because plaintiff failed to rebut defendant's theory that the similar color and shape of its tablets benefitted the patient population. |
| Adams Mfg. Corp. v. Stanek, No. 12-1430, 2014 WL 978116 (W.D. Pa. Mar. 12, 2014) | Suction cup with concentric two-ring design | Granting summary judgment for PTO because no reasonable jury could find design non-functional. |
| John M. Middleton, Inc. v. Swisher Int'l, Inc., No. 03-3908, 2006 WL 2129209 (E.D. Pa. July 26, 2006) | Pipe-tobacco cigar | Denying defendant's motion for summary judgment because of fact issues regarding allegedly functional elements of plaintiff's trade dress. |
| McAirlaids, Inc. v. Kimberly-Clark Corp., 756 F.3d 307 (4th Cir. 2014) | Pixel pattern on absorbent, textile-like material | Reversing grant of summary judgment to defendant because plaintiff raised fact issues regarding functionality of its registered trade dress. |
| Groeneveld Transport Efficiency, Inc. v. Lubecore Int'l, Inc., 730 F.3d 494 (6th Cir. 2013) | Automotive grease pump | Reversing district court's denial of defendant's Rule 50 motion because plaintiff's evidence was insufficient to enable a reasonable jury to find that the grease pump's design was nonfunctional. |
| Secalt S.A. v. Wuxi Shenxi Constr. Mach. Co., Ltd., 668 F.3d 677 (9th Cir. 2012) | Traction hoist | Affirming grant of summary judgment because plaintiff failed to present evidence of non-functionality. |
| Jay Franco & Sons, Inc. v. Franek, 615 F.3d 855 (7th Cir. 2010) | Round beach towel | Affirming grant of summary judgment because of determination that round beach towel is functional. |
| The Antioch Co. v. Western Trimming Corp., 347 F.3d 150 (6th Cir. 2003) | Scrapbook album and page configurations | Affirming grant of summary judgment because of determination that scrapbook album and page configuration is functional. |

A central theme running through this sampling of cases on functionality is that courts

may determine functionality on summary judgment where there is no dispute of material fact

regarding the functionality of the product at issue and no reasonable jury could find the product to be nonfunctional. In <u>TrafFix</u>, the Supreme Court evaluated unregistered trade dress in a visible dual-spring design used to stabilize temporary road signs in adverse wind conditions. 532 U.S. 26. The district court had found the device to be functional and granted summary judgment for the defendant, but the Sixth Circuit reversed, holding that the district court had failed to take into account design alternatives available to the defendant. <u>Id.</u> at 26-27. The Supreme Court reversed the Court of Appeals, concluding that the dual-spring device was functional because an expired utility patent for the device was "strong evidence" the device was functional and plaintiff failed to meet its burden of showing its unregistered trade dress was non-functional. <u>Id.</u> at 29-30.

In <u>U.S. Golf</u>, the Third Circuit affirmed the district court's grant of summary judgment in favor of the defendant, holding that the district court correctly found that the plaintiff had failed to raise a disputed issue of material fact as to the functionality of defendant's mathematical formula. 749 F.2d at 1034. In <u>Jay Franco</u>, the Seventh Circuit affirmed the district court's grant of summary judgment in favor of the defendant, concluding that the district court correctly found plaintiff's registered trademark in a round beach towel design was functional. 615 F.3d at 860-61. In <u>Secalt</u>, the Ninth Circuit affirmed the grant summary judgment in favor of the defendant on the question of a traction hoist's functionality because the plaintiff was "unable to present evidence of nonfunctionality." 668 F.3d at 685.

However, summary judgment is inappropriate where a dispute of material fact precludes the court from determining that the product is functional. In <u>McAirlaids</u>, the Fourth Circuit vacated the grant of summary judgment to the defendant, holding that there were disputes of fact regarding whether the pixel pattern on plaintiff's absorbent material was functional. 756 F.3d at 314. Unlike <u>TrafFix</u>, the court noted that defendant, not plaintiff, had the burden of proof on

functionality because the pixel pattern was registered, and that the pixel pattern was not covered by an expired utility patent. Id. at 311-12. The court concluded that the parties had a genuine dispute of material fact over whether the pixel pattern was selected for functional reasons or whether the pixel pattern was plaintiff's "purely aesthetic choice among many alternatives." Id. at 312-13.

In John M. Middleton, Judge Pollak refused to grant summary judgment in favor of the defendant on plaintiff's trade dress infringement claim involving pipe-tobacco cigars, finding that the plaintiff "has produced sufficient evidence that some features of its asserted trade dress are non-functional so as to raise a genuine issue of fact." 2006 WL 2129209, at *5. The court found that plaintiff had offered evidence the cigar tip may be non-functional because numerous alternatives existed, while defendant had not produced evidence that the tip affects the use or price of the cigars. Id. The court also found plaintiff had offered evidence that the diameter of the cigars may be non-functional because there are alternatives, while defendant, although offering evidence that reducing the diameter results in cost savings, had not established that the specific diameter of the product was functional. Id. Finally, the parties disputed whether the color and speckling of the wrapper was a consequence of the manufacturing process or a specific design choice by plaintiff. Id. At bottom, the parties' factual dispute centered on whether these features of plaintiff's cigar were arbitrary design flourishes or functional aspects of the product.

### 3. Functionality of Chudleigh's Registered Trade Dress

The parties dispute whether Chudleigh's registered trade dress is functional. Because the Court assumes that Chudleigh's trademark registration covers both the hand-folded and machine-folded versions of the Blossom Design for purposes of the parties' summary judgment motions, Sweet Street has the burden of showing functionality. In order to grant summary judgment on

the issue of functionality, the Court must determine that there is no genuine dispute of material fact such that no reasonable jury could find the Blossom Design to be non-functional.

Sweet Street contends the Blossom Design was influenced by several functional factors, including the following:

1. The shape is important because it can be hand-held (Pl. SOF ¶ 117).

2. The market was looking for a single serving of a pie (id. ¶ 118).

3. The Blossom product was configured to solve the problem in restaurants of excess waste and unattractive appearance when cutting slices of pie large enough to contain multiple servings (id. ¶ 119).

4. The shape was round because it was less expensive to manufacture than a square pastry, and a rectangular shape broke too easily (id. ¶ 120).

5. The dough was turned up over the filling to hold the filling inside the pastry (id. ¶ 121).

6. Chudleigh's boasts the convenience of being able to quickly heat the pre-baked product, and Chudleigh's notes that "Blossoms can be held warm (100 F) for up to 3 hours and still taste great!  So put them under a heat lamp – or on a grill – or in a warming box and hold them until it is time to serve!"  (id. ¶ 122).  This is clearly a functional aspect of the product.

7. The folds were just a pretty way to finish the top (id. ¶ 123).  The six-folded design was one of several possible alternatives, all of which serve the same function of holding the filling inside the pastry.

8. The product was one piece, with one opening, because when you heat it in a microwave and there is more than one opening, the filling may spurt out of the pastry shell when heated and the microwave will get dirty (id. ¶ 124).

9. The design was commercially viable to produce at a price point (id. ¶ 125).

Moreover, Sweet Street shows that Scott Chudleigh stated in his deposition that six folds worked best and was the most beautiful (id. ¶ 126).   "Beauty" and appearance are important

ingredients in marketing food products designed for public sale.  In this case, the appearance (or design) is inherently functional, and Chudleigh's has not produced any facts to dispute this.[8]

Chudleigh's contends that the Blossom design is non-functional.  Chudleigh's argues that Sweet Street's baking expert, Dean Lavornia, stated that there are many ways to make a crostata and the number of folds in a crostata is irrelevant, so the six folds or petals of the Blossom Design should be considered "incidental, arbitrary or ornamental" and, therefore, nonfunctional. See ECF 73, Ex. 33, Lavornia Expert Report at 6, 10.  Moreover, Chudleigh's argues that Sweet Street's conception of functionality would wipe out most product configuration trademarks, including those of the Coke bottle and Cartier wristwatch.

The Blossom Design consists of the following features, as articulated by Chudleigh's:

1.  A single-serving dessert item;

2.  A round shape;

3.  Six folds or petals of dough;

4.  Such folds or petals being folded upward and around a filling;

5.  Such upward folding resulting in the folds or petals partially overlapping each other;

6.  Such upward folding yielding a regular spiral pattern resembling the shape of a blossom; and

7.  Such upward folding leaving an opening at the top.

See ECF No. 91, Ex. A, Def. Supp. Submission.  Because Chudleigh's claims trade dress rights in the Blossom Design, not in its individual features, the Court considers the functionality of the Blossom Design as a whole.  See Am. Greetings, 807 F.2d at 1143.

---

[8] Sweet Street also argues that an expired utility patent held by Form & Frys must be taken into account when evaluating the machine-folded Blossom configuration.  But the Form & Frys patent covers a method to fold dough, not a product design.  Accordingly, the Form & Frys patent is not relevant to the functionality of the Blossom Design.

Considering the composite Blossom Design, the Court concludes the evidence shows that the Blossom Design "is essential to the use or purpose" of the pastry dessert and "affects the cost or quality" of the product. See TrafFix, 532 U.S. at 32. The evidence leads to only one conclusion, that the Blossom Design is essential to the Blossom's function as a pastry dessert and is not simply an "incidental, arbitrary or ornamental" product feature.

The undisputed evidence in the record indicates that the Blossom Design's single-serving size, round shape, and incorporation of six folds or petals of upturned, partially overlapping dough were adopted to solve particular marketing and manufacturing problems:

- The single-serving size was adopted to respond to the needs of the market, which was looking for a single-serving of pie. See ECF 83, Ex. 81, Goldberg Dep. 92:8-93:14, Apr. 25, 2014.

- The Blossom was configured to avoid the need to cut slices from a larger pastry containing multiple servings. See ECF 83, Ex. 77, Chudleigh Dep. 50:14-51:1, Nov. 14, 2013.

- The round shape was chosen for practical reasons: a triangular shape required too much pastry to retain the apples and got soggy when microwaved, a square shape cost more and was harder for restaurants to work with, and a rectangular shapes was too weak and broke too easily. See id. 51:24-54:10. Chudleigh's also selected a round shape because it "would mimic a round apple pie." See id. 54:6-7. Furthermore, a circle is a basic design element over which courts should not grant a party exclusive use. See Jay Franco, 615 F.3d at 860 ("Granting a producer the exclusive use of a basic element of design (shape, material, color, and so forth) impoverishes other designers' palettes.").

- The opening at the top was essential to the Blossom's function. As Chudleigh's marketing expert George Goldberg testified in his deposition, this design was necessary because if there was more than one opening, the filling would spurt out when the product was heated and the microwave would get dirty. <u>See</u> ECF 83, Ex. 81, Goldberg Dep. 215:6-16. A hole at the top is also necessary to vent steam when the product is heated. <u>Id.</u> Moreover, as Lavornia testified, the hole at the top permits consumers to see the type of fruit filling in the product. <u>See</u> ECF 73, Ex. 33, Lavornia Expert Report at 10.

- The six folds or petals of upturned, partially overlapping dough folded around a filling in a spiral pattern are functional under the first prong of the <u>TrafFix</u> test. The six folds or petals of upturned, partially overlapping dough folded in a spiral pattern serve to hold the filling inside the pastry shell. Both Scott Chudleigh and Dean Lavornia stated that without the upward folds of dough around the filling, the filling could spurt out. <u>See</u> ECF 83, Ex. 77, Chudleigh Dep. 55:24-56:10 ("Q: So somehow you have to be able to hold the – the filling in; is that correct?" A: "Yes."); ECF 83, Ex. 79, Lavornia Dep. 44:14-18, Apr. 25, 2014 ("The dough is kind of brought up and gathered around the top to contain the filling so it obviously doesn't spill out over your sheet pan and you lose that money there. It kind of contains the filling."); ECF 73, Ex. 33, Lavornia Expert Report at 10 ("The upward folds function to hold in the filling, and maintain the round shape of the tart."). Without upturned dough, Scott Chudleigh stated that the product would have looked more like a pizza. <u>See</u> ECF 83, Ex. 77, Chudleigh Dep. 55:24-56:3. Although Chudleigh's contends the six folds or petals and the spiral pattern should be considered non-functional because the number

of folds or petals is "incidental, arbitrary or ornamental," Scott Chudleigh testified that the number of folds or petals is dictated in part by the "size of the product and the amount of filling inside the product." Id. 62:5-9.

Viewing all of the above evidence in the light most favorable to Chudleigh's, Sweet Street has produced evidence that the six folds or petals have a functional purpose—containing the filling—that is essential to the Blossom's ability to function as a pastry dessert.

Although the allocation of the burden of proof and the absence of an expired utility patent in this case are similar to McAirlaids, that case is distinguishable. In McAirlaids, there was a dispute of material fact as to whether the pixel pattern at issue affected the quality of the product. See McAirlaids, 756 F.3d at 314. Here, by contrast, without the six folds or petals of upturned, partially overlapping dough, the filling would spurt out and the product would look more like a pizza, which would affect the quality of the product and its functionality as a round, single-serving pastry dessert.

Sweet Street also appears to argue that the six folds or petals should be deemed functional under the second prong of the TrafFix test. Scott Chudleigh testified that the six folds were a pretty way to finish the top, as well as that they worked best and were most beautiful. See ECF 83, Ex. 77, Chudleigh Dep. 55:11-12; 56:7-9    The Court finds barring competitors from using six folds or petals would place competitors at a significant, non-reputation-related disadvantage. Because the evidence indicates that six folds worked best and was most beautiful for making a product the size of the Blossom, competitors would likely be relegated to an inferior design for a single-serving, round apple pastry product of similar size if they were barred from using six folds or petals. Although Chudleigh's contends that the evidence shows that a crostata can have any number of folds so that many alternative designs are open to Sweet Street,

the Supreme Court has deemed it unnecessary for courts to speculate about alternative design possibilities if the design at issue is functional. See TrafFix, 532 U.S. at 32.

Moreover, there is evidence that the six folds or petals are not a purely aesthetic feature of the Blossom, but are inextricably linked to utilitarian functions of the product, including the size and shape of the Blossom and the need to hold a certain amount of filling inside the pastry. See Keene, 653 F.2d at 825 (noting that in evaluating aesthetic functionality courts "focus on the extent to which the design feature is related to the utilitarian function of the product or feature"). In Keene, the Third Circuit affirmed the district court's finding, on a motion for a preliminary injunction, that a wall-mounted luminaire was functional because the design of the luminaire was dictated in part by the luminaire's architectural compatibility with the structure or building on which it was to be mounted. Id. Like the design of the luminaire in Keene, the Blossom Design, "rather than serving merely as an arbitrary expression of aesthetics, is intricately related to its function." See id. at 826.

Furthermore, Chudleigh's comparison of the Blossom to the Coke bottle or Cartier wristwatch is unpersuasive. First, the Coke bottle is product packaging, which is held to a lower standard of protectability than the product configuration at issue in this case. See Wal-Mart Stores, 529 U.S. at 215; Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 115-16 (2d Cir. 2001). Second, the Coke bottle is "incidental, arbitrary or ornamental," unlike the Blossom design, because the particular shape of the Coke bottle is not "essential to the use or purpose of the" bottle—holding soda—and does not "affect[] the cost or quality" of the article, since a plain glass bottle would likely be cheaper to manufacture than the Coke bottle and would hold the soda equally well. Similarly, Cartier's wristwatch designs are "incidental, arbitrary or ornamental" because the designs are not "essential to the use or purpose of the" watch—telling time—and do

not "affect[] the cost or quality" of the article, since the watch could likely be made much more cheaply and tell time equally well without the design flourishes Cartier incorporates.

Permitting Chudleigh's to maintain a trademark in the functional Blossom Design would overextend trade dress law, allow Chudleigh's to claim proprietary rights in the elements that make the Blossom function as a round, single-serving apple-filled pastry, and deny competitors the ability to compete by manufacturing a similar product incorporating these functional elements.[9]

However, the Court's decision does not leave Chudleigh's wholly without means to protect and distinguish the Blossom product. Chudleigh's owns a registered trademark in the BLOSSOM word mark—which is not at issue in this case—so Chudleigh's may assert its rights in that word mark against competitors who advertise pastry products as a BLOSSOM. Furthermore, although appearance is important to the marketing of a dessert product, the taste of that product is equally important, and this result does not prevent Chudleigh's from winning market share by producing a superior tasting dessert.

**D. Tortious Interference Claims**

Sweet Street also contends that Chudleigh's tortiously interfered with Sweet Street's existing and prospective contractual relations with Applebee's and prospective contractual relations with Form & Frys.

To state a claim under Pennsylvania law for tortious interference with existing or prospective contractual relations, a party must show (1) the existence of contractual relations or prospective contractual relations with a third party; (2) the purpose or intent to harm the existing relationship or prevent the relation from occurring; (3) the absence of a privilege or justification

---

[9] Because the Court has determined the Blossom Design to be functional, the Court need not consider secondary meaning or likelihood of confusion.

for defendant's conduct; and (4) actual damages. <u>Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.</u>, 140 F.3d 494, 530 (3d Cir. 1998); <u>Thompson Coal Co. v. Pike Coal Co.</u>, 412 A.2d 198, 471 (Pa. 1979); <u>Pelagatti v. Cohen</u>, 536 A.2d 1337, 1343 (Pa. Super. Ct. 1988). For interference with prospective contractual relations, there must be "reasonable probability" of eventual contract formation. <u>Thompson Coal</u>, 412 A.2d at 471.

In ruling on Chudleigh's motion to dismiss, the Court concluded that Chudleigh's cease-and-desist letter to Applebee's—if genuine—would constitute petitioning activity immunized under the <u>Noerr-Pennington</u> doctrine, which protects parties engaged in legitimate petitioning activity.[10] <u>See</u> ECF No. 23 at 9-11. But the Court found Sweet Street had alleged sufficient facts, for purposes of a Rule 12(b)(6) motion, to state a plausible claim as to whether the "sham" exception to the <u>Noerr-Pennington</u> doctrine applied. <u>See id.</u> at 11-14.

To receive First Amendment protection under the <u>Noerr-Pennington</u> doctrine, litigation activity must be "genuine," not a mere "sham." <u>BE & K Constr. Co. v. NLRB</u>, 536 U.S. 516, 525-26 (2002). "[S]ham litigation is present where the lawsuit is objectively baseless and subjectively motivated by a desire to impose anticompetitive harm from the judicial process rather than obtain judicial relief." <u>Erbe Elektromedizin GmbH v. Candy Tech. LLC</u>, 629 F.3d 1278, 1291 (Fed. Cir. 2010) (citing <u>Prof'l Real Estate Investors v. Columbia Pictures Indus., Inc.</u> ("PRE"), 508 U.S. 49, 60-61 (1993)). Litigation activity is "objectively baseless" if "no reasonable litigant could realistically expect success on the merits." <u>PRE</u>, 508 U.S. at 60; <u>Cheminor Drugs, Ltd. v. Ethyl Corp.</u>, 168 F.3d 119, 122-23 (3d Cir. 1999). If the "objectively

---

[10] This Court noted that although the Third Circuit had yet to rule whether the right to petition encompasses private presuit demand letters in trademark litigation, the Third Circuit would be likely to rule in the affirmative. The Court reasoned that "[s]ince <u>Noerr-Pennington</u> immunity is 'based' on 'First Amendment principles,' <u>Cheminor Drugs, Ltd. v. Ethyl Corp.</u>, 168 F.3d 119, 128 (3d Cir. 1999), there is little intelligible reason why presuit demand letters in the antitrust context should be treated differently than those in analogous statutory contexts." <u>See</u> ECF No. 23 at 10-11.

baseless" standard is met, a party must then show that the petitioning party had the subjective intent to inhibit competition, rather than to seek government redress.  PRE, 508 U.S. at 60-61.

Sweet Street has failed to raise a disputed issue of material fact as to whether Chudleigh's cease-and-desist letter was a "sham."  When Chudleigh's sent the cease-and-desist letter to Applebee's, it is undisputed that Chudleigh's had a valid trademark in the Blossom Design.  It is also undisputed that Applebee's was selling the turnover manufactured by Sweet Street. Objectively, it is eminently reasonable for the holder of a valid, incontestable trademark to send a cease-and-desist letter to the seller of an infringing product.  See id at 65 ("A court could reasonably conclude that Columbia's [copyright] infringement action was an objectively plausible effort to enforce rights.").  Sweet Street's theory would require the Court to believe that Chudleigh's knew it had no valid rights in the Blossom Design, for which Chudleigh's held a valid, incontestable federal trademark registration, when Chudleigh's sent the cease-and-desist letter.  There is no evidence in the record that Chudleigh's believed it had no valid rights in the Blossom Design or that Chudleigh's expected to fail on the merits of its trademark claims.

Nor can Sweet Street point to any evidence in the record supporting its contention that Chudleigh's actions were motivated by a desire to impose anticompetitive harm on Sweet Street. The evidence shows that Chudleigh's and Sweet Street discussed possible outsourcing of the turnover in September and October 2010 (Pl. SOF ¶¶ 21-25; Def. SOF ¶¶ 36-37).  In late October or early November, Sweet Street informed Chudleigh's that it would not be outsourcing the turnover to Chudleigh's (Pl. SOF ¶¶ 31-32).  On August 15, 2011, Applebee's launched Sweet Street's turnover as a limited time offer (id. ¶ 72).  The next day, Scott Chudleigh noticed a story about Applebee's new Apple Turnover on a website (id. ¶ 76).  On August 24, 2011, Chudleigh's counsel sent the cease-and-desist letter to Applebee's (id. ¶ 79; Def. SOF ¶ 52).

Sweet Street infers from this timeline that Chudleigh's knew Sweet Street was the producer of the Apple Turnover all along and sent the cease-and-desist letter to Applebee's with the "subjective intent" of imposing anticompetitive harm on Sweet Street.  But Sweet Street presents no evidence that Chudleigh's harbored such "subjective intent" over the nine or ten months between Chudleigh's discussions with Sweet Street about outsourcing and Chudleigh's sending the cease-and-desist letter to Applebee's.

Sweet Street's tortious interference claim regarding Form & Frys fails because Sweet Street's allegations are based on circumstantial inferences that are not supported by evidence in the record.  There is evidence that Chudleigh's called Form & Frys twice in November 2010, but there is no evidence in the record that Chudleigh's called Form & Frys to pressure the company not to sell the Hercules machine to Sweet Street.  The only evidence in the record as to the contents of those calls indicates that those calls may have been about repairs or ordering replacement parts (Def. SOF ¶¶ 21-24; Def. Supp. SOF ¶¶ 11-15).

Furthermore, the evidence indicates doubts about Sweet Street's alleged timeline.  First, Chudleigh's admits to telling Form & Frys in the mid-2000s that Chudleigh's owned a patent on the shape of the Blossom Design (Def. SOF ¶ 21; Pl. SOF ¶¶ 54-55).  However, Chudleigh's representations to Form & Frys about Chudleigh's proprietary rights in the Blossom Design occurred well before the existence of any prospective contractual relations between Sweet Street and Form & Frys.  Second, Chudleigh's made calls to Form & Frys in November 2010.  Form & Frys provided a proposal to Rondo to sell the Hercules machine to Sweet Street in late February 2011 (Pl. SOF ¶ 52).  Only in June 2011 did Form & Frys reverse course and refuse to sell the Hercules machine to Sweet Street (id. ¶ 61-63).  There is no evidence in the record that Form & Frys reversed course because of Chudleigh's actions, and, if Chudleigh's had advised Form &

Frys not to deal with Sweet Street in November 2010, it is unlikely Form & Frys would have initially provided a proposal to sell the Hercules machine to Sweet Street in February 2011 before refusing to sell the machine in June 2011. Although Form & Frys may have reversed course of its own accord because Form & Frys understood Chudleigh's to possess proprietary rights in the Blossom Design, it is Chudleigh's intent, not the intent of Form & Frys, that is determinative of the tortious interference claim. Accordingly, the evidence does not show that Chudleigh's possessed the purpose or intent to prevent the contractual relations between Sweet Street and Form & Frys from occurring, which is required for a tortious interference claim under Pennsylvania law.

There is insufficient evidence on which a jury could find for Sweet Street on the tortious interference claims, so Chudleigh's is entitled to summary judgment as to tortious interference.

**E. Other Claims**

Because the Court has determined Chudleigh's Blossom Design is functional, the Court will grant summary judgment in favor of Sweet Street on Count I of Sweet Street's Complaint (non-infringement). However, the Court will refrain from ruling on Counts II (invalidity of Chudleigh's trademark registration) and III (cancellation of Chudleigh's trademark registration as generic) of Sweet Street's Complaint and deciding whether to declare Chudleigh's trademark registration for the Blossom Design invalid and/or cancelled as functional until the Court has had the benefit of supplemental submissions from the parties as detailed in the attached Order. The Court will dismiss with prejudice Counts IV (obtained by fraud) and V (abandonment) of Sweet Street's Complaint because Sweet Street has abandoned those claims.

The Court will dismiss Sweet's Street's motion for summary judgment on Chudleigh's counterclaims of trademark infringement (Count I), false designation of origin (Count II), and

state law unfair competition (Count III) because those claims have become moot in light of the Court's ruling that Chudleigh's Blossom Design is functional.

### III. Conclusion

The Court finds Chudleigh's Blossom Design to be functional and will grant summary judgment in favor of Sweet Street on Sweet Street's non-infringement claim (Count I). However, the Court will grant summary judgment in favor of Chudleigh's on Sweet Street's tortious interference claims (Counts V and VI) because Sweet Street has failed to produce evidence to meet the required elements of those claims under Pennsylvania law.

An appropriate order follows.

O:\CIVIL 12\12-3363 sweet street v. chudleigh's\12-3363 -- Memorandum re Summary Judgment.docx